Courtland L. Reichman (SBN 268873)
creichman@mckoolsmith.com
MCKOOL SMITH HENNIGAN, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, California 94065
650.394.1400 Telephone
650.394.1422 Facsimile

Steven J. Pollinger (*Admitted Pro Hac Vice*)
spollinger@mckoolsmith.com
Craig N. Tolliver (*Admitted Pro Hac Vice*)
ctolliver@mckoolsmith.com
Geoffrey L. Smith (*Admitted Pro Hac Vice*)
gsmith@mckoolsmith.com
Eric C. Green (*Admitted Pro Hac Vice*)
egreen@mckoolsmith.com
Trent E. Campione (SBN 200273)
tcampione@mckoolsmith.com
MCKOOL SMITH, P.C.
300 West 6th Street, Suite 1700
Austin, Texas 78701
512.692.8700 Telephone
512.692.8744 Facsmile

Robert J. Muller (SBN 189651)
Douglas P. Roy (SBN 241607)
CYPRESS LLP
11111 Santa Monica Blvd., Suite 500
Los Angeles, CA 90025
424.901.0123 Telephone
424.750.5100 Facsimile

Attorneys for Plaintiffs
Good Technology Corporation and
Good Technology Software, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| GOOD TECHNOLOGY CORPORATION AND GOOD TECHNOLOGY SOFTWARE, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> MOBILEIRON, INC., <br><br> Defendant. | Case No. 5:12-CV-05826-PSG <br><br> **OPPOSITION TO MOBILE IRON INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(C)** |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................................................... 1

II.    THE INVENTION OF THE PATENTS AT ISSUE ........................................................... 1

    A.    The Wireless Device Access Policy Enforcement Patent ....................................... 1

    B.    The Wireless Device Remote Software Update Distribution Patent ...................... 2

III.   PATENT ELIGIBILITY STANDARDS ........................................................................... 2

IV.    ARGUMENT ................................................................................................................... 4

    A.    MobileIron's Motion Is Procedurally Defective ..................................................... 5

    B.    The Wireless Device Access Policy Enforcement Patent Satisfies § 101 ................................................................................................................... 6

        1.    The Access Policy Enforcement Patent Does Not Claim "Abstract Ideas" ................................................................................................ 6

        2.    The Access Policy Enforcement Patent Teaches Inventive Concepts ................................................................................................. 8

    C.    The Wireless Device Software Update Distribution Patent Satisfies § 101 ................................................................................................................... 10

        1.    The Software Update Distribution Patent Does Not Claim "Abstract Ideas" ............................................................................................... 10

        2.    The Software Update Distribution Patent Teaches Inventive Concepts ................................................................................................ 13

V.     CONCLUSION ............................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Accenture Global Services GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013) .............................................................................................. 8

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ............................................................................................. 3, 8, 11, 14

*Bancorp Servs., L.L.C., v. Sun Life Assur. Co. of Canada (U.S.)*,
    687 F.3d 1266 (Fed. Cir. 2012) ........................................................................................... 4, 7

*Bascom Research, LLC v. LinkedIn, Inc.*,
    2015 U.S. Dist. LEXIS 4606 (N.D. Cal. Jan. 2, 2015) .................................................... 12, 13

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ............................................................................................................... 2

*Biogenex Labs., Inc. v. Ventana Med. Sys., Inc.*,
    2006 U.S. Dist. LEXIS 57067 (N.D. Cal. 2006) ................................................................... 5

*Cal. Institute of Tech. v. Hughes Commcn's Inc.*,
    2014 U.S. Dist. LEXIS 156763 ............................................................................................. 3

*Cogent Med., Inc. v. Elsevier Inc.*,
    2014 U.S. Dist. LEXIS 139856 (N.D. Cal. Sept. 30, 2014) ................................................. 12

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) ............................................................................................. 7

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014) ..................................................................................... passim

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980) ............................................................................................................... 3

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ............................................................................................................... 3

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    133 S. Ct. 1289 (2012) ........................................................................................................ 3, 8

*Mediatek Inc. v. Freescale Semiconductor, Inc.*,
    2014 U.S. Dist. LEXIS 22442 (N.D. Cal. Feb. 21, 2014) ..................................................... 6

*Modern Telecom Sys. LLC v. Juno Online Servs.*,
    2015 U.S. Dist. LEXIS 33835 (C.D. Cal. Mar. 17, 2015) ......................................... 4, 14, 15

*Nova Measuring Instruments Ltd. v. Nanometrics, Inc.*,
 417 F. Supp. 2d 1121 (N.D. Cal. 2006) .................................................................................. 5

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
 467 F.3d 1355 (Fed. Cir. 2006) ............................................................................................... 5

*Rockstar Consortium US LP, Inc. v. Samsung Elecs. Co., Ltd.*,
 2014 U.S. Dist. LEXIS 67097 (E.D. Tex. May 15, 2014) ....................................................... 9

*UbiComm LLC v. Zappos IP, Inc.*,
 2013 U.S. Dist. LEXIS 161559 (D. Del. Nov. 13, 2013) ........................................................ 8

*Ultramercial, Inc. v. Hulu, LLC*,
 772 F.3d 709 (Fed. Cir. 2014) ................................................................................................. 7

**STATUTES**

35 U.S.C. § 101 .................................................................................................................... passim

## I. INTRODUCTION

MobileIron asks this Court to adjudicate, on the pleadings, that the asserted claims in two Good Technology patents—U.S. Patent No. 7,970,386 ("'386 Patent") and U.S. Patent No. 7,702,322 ("'322 Patent")—are invalid under § 101 for impermissibly covering abstract ideas. The motion should be denied.

First, it is procedurally infirm:  MobileIron failed to identify either patent as invalid under § 101 in its Patent Local Rule 3-3 contentions.  Under the local rules, it is barred from asserting invalidity on that basis now.  Second, MobileIron incorrectly casts the claims as abstract by failing to apply (or even acknowledge) this Court's construction of disputed terms within the claims. Finally, MobileIron's motion rests on an absurdly broad characterizations of the inventions claimed in the patents—characterizations that conflict with its own expert's descriptions of the inventions.  The actual inventions, as construed by this Court, describe solutions to recognized problems specifically arising in the realm of wireless networks—solutions necessarily rooted in computer technology.  Thus, the claims are patent-eligible.

## II. THE INVENTION OF THE PATENTS AT ISSUE

### A. The Wireless Device Access Policy Enforcement Patent

The '386 Patent discloses a "[s]ystem and method for monitoring and maintaining a wireless device." ('386 Patent, Title.)  The '386 patent generally addresses the problem of providing remote monitoring and maintenance of wireless devices that have access to critical data (*e.g.*, corporate email, documents, etc.) using a service application (*e.g.*, mobile platform application) on the wireless device. (*Id.*, 1:20-28; 44-50.)  It explains that the "service," is an application that "provides wireless messaging and data access for the wireless device … in connection with a main server, . . . [which] may be maintained by an organization that owns and operates the wireless device." (*Id.*, 4:8-14.)  To allow monitoring and maintenance, a "service" on a wireless device is "communicatively" coupled to a "rules engine."  The "rules engine" receives a set of rules from a server and executes the set of rules so as to monitor and take action on the wireless device based on policies that can be configured by an administrator. (*Id.*, 4:29-67, 5:22-67.)  The rules engine also monitors conditions of critical systems and software on the device.

When certain conditions are detected as indicated by a rule, the rules engine, without further communications with a server, takes actions on the wireless device, which maintains settings associated with the service application. (Doc. 135 at 3.) These actions may include initiating software downloads and upgrades, shutting down one or more applications on the wireless device, modifying critical data on the wireless device, and erasing critical data on the wireless device. (*See id.*, claims 2-3.)

### B.     The Wireless Device Remote Software Update Distribution Patent

The '322 Patent discloses a "[m]ethod and system for distributing and updating software in wireless devices." ('322 patent, Title.) As explained in the specification, the invention relates to the distribution and updating of software for wireless devices based on administrator-defined software policies and device compatibility. With the invention, software policies at a customer site provide rules to identify the updates for a particular wireless device, and may notify the wireless devices that updates are available. (*Id.*, 3:24-29.) Additionally, a web-based software server provides software updates for the wireless device and the wireless device provides "device specific" information to the web-based software server so that compatibility of the application for a particular wireless device can be determined. (*Id.*, 3: 26-38. 47-52, col. 4:15-22.) As described in the specification, the web-based software server searches a compatibility matrix to determine whether an update is compatible with the wireless device. (*Id.*, 3:47-4:36; col. 4:15-22.) If the update is determined to be compatible with the wireless device, the web-based software server provides information to the wireless device that is used to download the update. (*Id.*, 3:29-34, 4:32-36.)

## III.    PATENT ELIGIBILITY STANDARDS

In Section 101, the Patent Act defines patentable subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. In drafting the Patent Act, "Congress took [a] permissive approach to patent eligibility to ensure that ingenuity should receive a liberal encouragement." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (internal quotation marks omitted).

That said, Section 101 does not encompass all products of human effort and ingenuity:  laws of nature, physical phenomena, and abstract ideas are not patentable.  *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).

In analyzing patent ineligibility challenges, courts "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (citations and internal punctuation omitted).  To assist in distinguishing between eligible and ineligible claims, *Alice Corp.* describes a two-part test.  First, a court must ask if the claim is "directed to one of those patent-ineligible concepts"—a law of nature, physical phenomenon, or abstract idea.  *Alice Corp.*, 134 S. Ct. at 2355.  Second, if the claim is directed to one of these concepts, the court must ask "[w]hat else is there in the claims before us?"  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 133 S. Ct. 1289, 1297 (2012).  "This second step determines whether there is an 'inventive concept' that 'ensure[s] that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  *Cal. Institute of Tech. v. Hughes Commcn's Inc.*, 2014 U.S. Dist. LEXIS 156763, *9 (citing *Alice Corp.*, 134 S. Ct. at 2355).

In *Alice Corp.*, the Supreme Court cautioned that courts should "tread carefully in construing th[e] exclusionary principle [of Section 101] lest it swallow all of patent law," noting that "at some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Alice Corp.*, 134 S. Ct. at 2354 (citations and internal punctuation omitted).  Thus, in the context of a Section 101 analysis, it is not appropriate to ignore the claims' actual limitations.  *See Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("In determining the eligibility of respondent's claimed process for patent protection under section 101, the[] claims must be considered as a whole.").

Applying *Alice Corp.*, the Federal Circuit most recently addressed patent eligibility in the context of inventions pertaining to networked computers in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).  In *DDR Holdings*, the Federal Circuit explained that computer networking claims satisfy § 101 eligibility when the claims as a whole "do not merely

recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," but instead provide a solution "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." For web-based inventions, courts also should consider, when the "limitations . . . of the . . . claims are taken together as an ordered combination, [whether] the claims recite an invention that is not merely the routine or conventional use of the Internet." *Id*. at 1257, 1259.

Finally, while "claim construction is not an inviolable prerequisite to a validity determination under § 101," the Federal Circuit has held that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis." *Bancorp Servs., L.L.C., v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012). That is because "the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Id*. at 1273-74.

In sum, while courts recognize that "[d]istinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult," *DDR Holdings*, 773 F.3d at 1255, issued claims are patent-eligible unless a challenging party meets its "burden of establishing that the patents in suit lack an inventive concept such that they are no more than a patent on an abstract idea." *Modern Telecom Sys. LLC v. Juno Online Servs.*, 2015 U.S. Dist. LEXIS 33835 at *20 (C.D. Cal. Mar. 17, 2015).

## IV. ARGUMENT

MobileIron's patent-eligibility challenge to the '386 and '322 patents is procedurally barred because it failed to disclose these § 101 contentions as required under this Court's Patent Local Rules. MobileIron also is wrong on the merits. MobileIron ignores this Court's construction of terms used in both patents—all of which confirm that the claims recite tangible limitations eligible for patent protection. Far from "merely recit[ing] the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," *DDR Holdings*, 773 F.3d at 1257, both the '386 and '322 patents claim concrete, innovative solutions, rooted in computer technology, that address the challenge of enforcing corporate access policies and efficiently distributing software updates on mobile wireless devices.

1  MobileIron's motion falls well short of satisfying its burden of proving that the patents claim only
2  an abstract idea and lack any inventive concept.

### A. MobileIron's Motion Is Procedurally Defective

The Local Rules of Practice for Patent Cases in the Northern District of California require service of Invalidity Contentions. Patent L.R. 3-3. Under Rule 3-3(d), a party opposing a claim of patent infringement must disclose "[a]ny grounds of invalidity based on 35 U.S.C. § 101" within a set deadline. MobileIron served its Rule 3-3 invalidity contentions by the deadline, but did not identify any claims in either the '386 and '322 patents as invalid under § 101. MobileIron's failure to disclose its § 101 invalidity contentions as to the '386 and '322 patents was not an oversight that can be ignored. To the contrary, MobileIron asserted in its Rule 3-3 invalidity contentions that claims in two *different* Good Technology patents were invalid under § 101. (*See* Declaration of Lawrence M. Hadley ("Hadley Dec."), Ex. 1 at 64-65.)

The requirement for invalidity contentions serves a critical function in patent litigation: These rules "require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." *Nova Measuring Instruments Ltd. v. Nanometrics, Inc.*, 417 F. Supp. 2d 1121, 1123 (N.D. Cal. 2006). See also *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 n.12 (Fed. Cir. 2006). Doing so avoids the "shifting sands" approach to patent litigation whereby a party changes its invalidity position during the course of litigation. *See Biogenex Labs., Inc. v. Ventana Med. Sys., Inc.*, 2006 U.S. Dist. LEXIS 57067 at *3 (N.D. Cal. 2006). "Amendment of the Invalidity Contentions . . . may be made only by order of the Court, which shall be entered only upon a showing of good cause." Patent L.R. 3-7. "'[G]ood cause' requires a showing of diligence." *O2 Micro*, 476 F.3d at 1366 (applying N.D. Cal. Patent Local Rules). "The burden is on the movant to establish diligence rather than on the opposing party to establish a lack of diligence." *Id.*

Here, MobileIron offers no justification for failing to disclose its contentions that the '386 and '322 patents are invalid under § 101. Under the *O2 Micro* standard, it cannot do so— particularly after amending its invalidity contentions as late as December 16, 2014, a full 9 weeks after the Court's Claim Construction Order. Nor does MobileIron seek to amend its contentions.

Invalidity theories not disclosed in Rule 3-3 contentions "are barred," and cannot be asserted at trial or otherwise. *See Mediatek Inc. v. Freescale Semiconductor, Inc.*, 2014 U.S. Dist. LEXIS 22442 at *3 (N.D. Cal. Feb. 21, 2014). Thus, MobileIron cannot rely on § 101 as an invalidity defense for the '386 and '322 patents, and its motion must be denied on this basis alone.

### B. The Wireless Device Access Policy Enforcement Patent Satisfies § 101

#### 1. The Access Policy Enforcement Patent Does Not Claim "Abstract Ideas"

The crux of MobileIron's patent ineligibility attack on the '386 wireless device access policy enforcement patent is the assertion that the patent claims nothing more than the "abstract idea of enforcing rules." (Mot. at 4.) MobileIron's characterization of the '386 patent ignores not only the invention described in the specification and recited in the claims, but this Court's construction of critical claim terms used in the claims.

Contrary to MobileIron's position, the '386 patent describes and claims much more than the idea of "enforcing rules." Rather, as expressly recited in the claims, the invention is limited to a wireless device (*e.g.*, a smart phone, not an abstraction) containing a "rules engine" executing instructions (transmitted remotely to the wireless device) to obtain information regarding the device's status and take actions on the device based on the information. ('386 Patent, 7:20-32.) Under this Court's constructions, the "rules engine" is anything but an abstract idea: It is a "component on the wireless device that, without further communications with a server, evaluates the conditions(s) specified in one or more rules received from the server and takes any action indicated by that rule." (Doc. 135 at 3.) In other words, the rules engine is stored and runs on a wireless mobile device to accomplish particular tasks, based on information obtained remotely from a particular source. Although a "rules engine," broadly speaking, enforces rules, the first prong of the *Alice* test turns on what is claimed, not whether the purpose of what is claimed can be reduced to some "abstract" core. And the rules engine alone, expressly recited in the '386 patent claims as operating on a wireless device in a particular manner, is decidedly not abstract.

MobileIron mischaracterizes what is claimed by impermissibly ignoring this Court's claim constructions. It is correct that the Federal Circuit has confirmed that patent eligibility under §

101 may be, in appropriate cases, decided on the pleadings prior to claim construction.  *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711 (Fed. Cir. 2014).  On the other hand, the Federal Circuit has cautioned that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs., L.L.C.* 687 F.3d at 1273-74.  Regardless, neither the Federal Circuit nor any lower court has sanctioned what MobileIron does here—raise disputed claim terms, engage in a *Markman* process, and then ignore the Court's concrete constructions because they conflict with the assertion that the claims are invalidly abstract.

The notion that a claim reciting a particular component, programmed in a particular way, is somehow "abstract" conflicts with federal appellate decision addressing abstractness under § 101 (*e.g.*, *Alice*, *Ultramercial*, *buySAFE*, and *Bankcorp*).  In these cases, each patent deemed too abstract to satisfy the § 101 eligibility requirements all recited a "commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations…." *DDR Holdings*, 773 F.3d at 1259 (upholding as patent eligible claims for generating a composite web page that combined visual elements of a "host" website with content of a third-party merchant site).  In contrast, the '386 patent's "rules engine" component within a wireless device, as construed by this Court, goes far beyond "merely recit[ing] the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *Id.* at 1257.  Just as in the claims found patent eligible in *DDR Holdings*, the '386 patent recites a hardware and software solution, "necessarily rooted in computer technology," that is programmed to "overcome a problem specifically arising in the realm of" wireless devices operating in networks. *Id.* at 1257.

MobileIron's argument that the '386 patent can be analogized to conventional nurse monitoring of patients in a hospital is misplaced.  First, the *Alice* test does not ask whether the invention can be analogized to some long-practiced, conventional activity.  Rather, the test looks

1  to whether the *claim* is "directed to one of those patent-ineligible concepts"—a law of nature,
2  physical phenomenon, or abstract idea. *Alice Corp.*, 134 S. Ct. at 2355. Although the Supreme
3  Court declined to "delimit the precise contours of the 'abstract idea' category," *id*. at 2357, it made
4  clear that the analysis focuses on what the "claims are drawn to"—not what they can be
5  analogized to. *Id*. at 2354. Second, MobileIron's nurse monitoring comparison is a false analogy
6  because it lacks the concrete component recited in the '386 claims—the rules engine programmed
7  to accomplish specific tasks in a wireless network. Third, MobileIron's argument conflicts with
8  the written report of its own non-infringement expert (Dr. Earl Sacerdoti), who explained that the
9  rules evaluated by the "rules engine" component on the wireless device, as recited in claims 8 and
10 9, "must come from the server, *be structured* to include a condition and action, and be evaluated
11 without communication with the server." (Hadley Dec., Ex. 2 at 16 (emphasis added).)

12 Finally, neither *Accenture Global Services GmbH v. Guidewire Software, Inc.*, 728 F.3d
13 1336 (Fed. Cir. 2013), nor *UbiComm LLC v. Zappos IP, Inc.*, 2013 U.S. Dist. LEXIS 161559 (D.
14 Del. Nov. 13, 2013) support MobileIron's invalidity assertion. Both cases predate *Alice* and *DDR*
15 *Holdings*. And the claims in neither case recited particular hardware equipment operating in a
16 network (*e.g.*, a mobile, wireless device), together with software programmed in a specified
17 manner to perform precise functions that solved a known problem within the device and network.
18 While the claims recited limitations requiring the performance of certain operations based on
19 conditions, they lacked any tangible structure—in sharp contrast to the tangible structures required
20 in this Court's constructions of the '386 patent's claim terms.

21          **2.**    **The Access Policy Enforcement Patent Teaches Inventive Concepts**
22 Even if MobileIron were correct (and it is not) that the '386 patent can be reduced to a
23 broad, abstract concept of "enforcing rules," the claims still satisfy § 101 eligibility because they
24 do far more than "simply instruct the practitioner to implement [that] abstract idea . . . on a generic
25 computer." *Alice Corp.*, 134 S. Ct. at 2359. Rather, the claims contain limitations that, alone and
26 in an ordered combination, "teach inventive, meaningful limitations that cover much more than
27 "well-understood, routine, [or] conventional activity." *Mayo Collaborative Servs.*, 132 S. Ct. at
28 1298.

The "rules engine" component alone, programmed to evaluate, *without* further communications with a server, the conditions specified in rules received from the server, and take action directed by that rule, was neither a routine or conventional part of wireless device technology at the time of the '386 patented invention, and MobileIron fails to prove otherwise.  As explained in the specification, wireless device technology at the time of the invention contained no components to "gather device information and enforce the existence or non-existence of applications on the device."  Nor did wireless device technology contain any "network infrastructure to support remote monitoring and maintenance of a wireless device."  ('386 Patent, 1:44-50.)  Thus, the inventors' "rules engine" solution—software executing within the wireless device that allows for compliance with established policies and security (independent of the network connection)—is precisely the type of "inventive concept" that can render an otherwise "abstract idea" patentable.  *See DDR Holdings, LLC*, 773 F.3d at 1259 (finding claims patent-eligible because they did not "recite a commonplace business method aimed at processing business information," did not "recite and invention that is . . . merely routine and conventional use of the Internet," and did not "attempt to preempt every application of the [abstract] idea."). The recited rules engine thus narrows the scope of any broad "rules enforcement" idea, to the "sphere of application rather than abstraction." *Rockstar Consortium US LP, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 U.S. Dist. LEXIS 67097, at *15 (E.D. Tex. May 15, 2014).  For precisely the same reasons articulated in *DDR Holdings*, the claims fall well outside MobileIron's broadly-worded abstract concept.

    MobileIron's argument that the rules engine, along with the recited service and monitoring time interval, refers to "long known messaging" "data transfer," and "data-gathering" techniques is beside the point.  "On a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions." *DDR Holdings,* 773 F.3d at 1257 (citing *Parks v. Booth*, 102 U.S. 96, 102 (1880) ("Modern inventions very often consist merely of a new combination of old elements or devices, whether nothing is or can be claimed except the new combination.")).  Thus, even if the inventors did not themselves invent the individual components used in their inventions, MobileIron still has not

McKool Smith Hennigan, P.C.
Redwood Shores, CA

proven the absence of an "inventive concept"—particularly when the intrinsic patent documents do show that the ordered combination of components provided a solution "necessarily rooted in computer technology" and arranged to "overcome a problem specifically arising in the realm of" wireless technology.  *Id*. at 1257.

### C. The Wireless Device Software Update Distribution Patent Satisfies § 101

#### 1. The Software Update Distribution Patent Does Not Claim "Abstract Ideas"

MobileIron's assertion of patent ineligibility as to the '322 wireless device software update distribution patent is equally flawed.  Like its argument regarding the '386 patent, MobileIron's motion rests on an assertion that the patent claims nothing more than the nonsensically broad "abstract idea of ensuring compatibility."  (Mot. at 9.)  Once again, MobileIron's characterization of the patent ignores not only the invention described in the specification and recited in the claims, but this Court's construction of terms used in the claims.

While "ensuring compatibility" is certainly a "long known concept," the '322 patent claims nothing close to this entire idea.  Rather, the invention, among other things, uses a compatibility check as one step in solving a problem known to exist within wireless devices operating in a wireless network.  Prior to the invention, software-supported, wireless handheld processing devices had to be physically connected to a computer any time new software needed to be installed.  ('322 Patent, 1:20-29.)  The inventors' solution—downloading software updates wirelessly over a network from a server—may seem a simple improvement today, but at the time of the invention constraints on network bandwidth (among other things) made it impractical.

The particular implementation described and claimed in the '322 patent made possible wireless distribution of updates over a network.  As described, a software server transmits the web-based location of updates (such as a universal resource locator) to a wireless device allowing the wireless device to download update files.  (*Id*., 3:29-34.)  In claim 7, the software server receives device-specific information from the wireless device and uses a "compatibility matrix" to identify the rules associated with the update available to download.  In claims 1 and 12, a customer site receives a message that updates are available for devices in its network, assigns a

software policy for a device defining rules that uniquely identify the updates, and transmits a notification to the wireless device that the updates are available to download.  The software server then searches the compatibility matrix for rules as in claim 7.  With these steps, the invention can reduce the burden on the bandwidth of a data network by spreading out the time when a wireless device will receive a notification that updates are available for download.  These steps also ensure that, for each available update, a wireless device only access updates for download that are compatible with the particular wireless device.  (*Id*., 3:35-38.)

The asserted claims are not "drawn to" an abstract idea, *Alice Corp.*, 134 S. Ct. at 2355, and MobileIron cannot overcome that fact by distorting the patent's separate and specific limitations into some irreducible core of "ensuring compatibility."  Under this Court's constructions (which MobileIron tellingly ignores), the terms used in the claims have precise meanings that define exactly how the updates take place:  "Searching a compatibility matrix [to identify/for] rules associated with each update" means that "for *each update*, searching rules that indicate whether an update is compatible with a particular wireless device."  "Rules uniquely identifying the updates for the wireless device" means "rules used to identify updates available for *a* particular wireless device."  And a "message indicating one or more files within the updates to [download/upload] means a "message indicating *at least one file* within the updates to [download/upload]."  (Doc. 135 at 2 (emphasis added).)  Thus, as construed, while the claims certainly require that downloads are compatible with a wireless device, compatibility is only one of many requirements needed to practice the invention.

MobileIron's strained effort to analogize the '322 invention to a "'parts interchange' used for buying auto parts" does not work.  (Mot. at 10-11.)  Besides the fact that nothing in *Alice Corp.* supports using analogies to conventional processes (as opposed to the claim itself) in determining whether an invention is drawn to an abstract idea, MobileIron's comparison does not meaningfully resemble the teachings of the *actual* limitations of the wireless device software distribution claims in the '322 patent.  First, a web-based software server receiving device specific information from a wireless device is entirely dissimilar to an auto-parts store learning the "model, make, and year" of a vehicle from a customer.  Effectively, MobileIron rewrites the first limitation

1   as a customer calling her network service provider to give the make, model and year of a phone.

2   Second, the compatibility matrix, as construed by this Court, has no common ground with a tire

3   "chart" that may list dozens of different tires for a given vehicle make, model and year or vice

4   versa.  Finally, the analogy falls apart at the download step as well.  Unlike the message received

5   in the invention to download a file on a particular software server (with the necessary information

6   to do so), a tire customer simply given a "tire size" may have many dozens to select from.  In sum,

7   MobileIron's hypothetical may be abstract, but the '322 patent claims are not.

8   Neither case that MobileIron cites "illustrate[s] the abstract nature of the '322 patent

9   claims."  (Mot. at 11-12.)  In *Cogent Med., Inc. v. Elsevier Inc.*, 2014 U.S. Dist. LEXIS 139856

10  (N.D. Cal. Sept. 30, 2014), the patent claimed a "method for providing data to a user from one or

11  more data sets."  None of the limitations recited anything as concrete as the '322 patent's claims

12  calling for searching rules to determine whether an update is compatible with a particular wireless

13  device and sending information so that a wireless device only download files particularly intended

14  for that device.  Moreover, the invention at issue in *Cogent* simply catalogued medical literature

15  into data sets and set aside particular information that may be relevant to the needs of a given user.

16  Unlike the '322 patent's solution to the problem of identifying and downloading software and

17  applications to a device over a wireless network with limited bandwidth, the *Cogent* patent offered

18  no solution "rooted in computer technology in order to overcome a problem specifically arising in

19  the realm of computer networks."  *DDR Holdings*, 773 F.3d at 1257.

20  *Bascom Research, LLC v. LinkedIn, Inc.*, 2015 U.S. Dist. LEXIS 4606 (N.D. Cal. Jan. 2,

21  2015) is no different.  The patent at issue simply recited a "method for providing a framework for

22  document objects located on a network…."  During prosecution, the Examiner rejected the claims

23  as patent ineligible under § 101, but eventually issued the patent after the Bascom added the words

24  "computer-implemented" into the claims.  *Bascom Research,* 2015 U.S. Dist. LEXIS 4606 at *8.

25  Not surprisingly, the district court, after applying *Alice* and *Ultramercial*, found that adding the

26  words "computer-implemented" into the claims were insufficient to turn an otherwise abstract

27  concept into patent-eligible subject matter.  *Bascom Research,* 2015 U.S. Dist. LEXIS 4606 at

28

*25. According to the court, the Bascom claims fell into a category of abstract "computer-based patents involving the creation and organization of data that have been invalidated after *Alice*." *Id*.

In contrast to *Cogent* and *Bascom*, the claims of the '322 patent, as construed by this Court, teach a tangible, concrete solution to a known wireless networking problem. Indeed, MobileIron's own expert describes the claims of the '322 patent in a way that belies MobileIron's characterization of the claims as "ensuring compatibility." According to Dr. Sacerdoti, the "'322 patent can be understood to claim a method for distributing files within updates to wireless devices." (Hadley Dec., Ex. 2 at 64.) Dr. Sacerdoti further explains the asserted claims in a way that, under the Court's claim constructions, is anything but abstract:

> The claims require a message to be received at a company's network . . . indicating that updates for an app are available" [after which an] IT administrator assigns a policy at the customer site that uniquely identifies the updates for particular devices. [This policy] defines 'rules used to identify updates available for a particular wireless device.' [Then, a] web-based software server searches a compatibility matrix for rules associated with each update…. One input for these rules is device-specific information sent by the device to the web-based software server. The web-based software server then sends the device a message informing the device as to which of one or more files within the updates should be downloaded.

(*Id*. at 65.) Nothing in Dr. Sacerdoti's detailed description hints at any level of abstractness (which likely explains MobileIron's decision to *exclude* the '322 patent from its § 101 invalidity contentions).

### 2. The Software Update Distribution Patent Teaches Inventive Concepts

Even if MobileIron were correct in casting the '322 patent claim as an irreducible core of "ensuring compatibility" (and it is not), the claims are limited to a very specific way of doing so—a way that solved a technological problem in wireless networks without coming anywhere close to staking claim to the entire idea. Without question, "the claims at issue do not attempt to preempt every application" of the idea of "ensuring compatibility." *DDR Holdings*, 773 F.3d at 1259. Rather, the claims are narrowly drawn to an "inventive concept" that "recite[s] a specific way" to identify and download software updates and applications to a wireless device across a wireless network "in order to solve a problem faced by" wireless devices operating in wireless networks

1  with limited bandwidth.  *Id*.  This specific and narrowly-drawn solution, using the recited

2  compatibility matrix to search for rules indicating "whether an update is compatible with a

3  particular wireless device," combined with an assigned software policy defining the rules uniquely

4  identifying the updates, "amounts to significantly more than a patent upon [the concept of

5  ensuring compatibility] itself."  *Alice Corp.*, 134 S. Ct. 2355 (quoting *Mayo*, 132 S. Ct. at 1294).

6      Under the Alice "inventive concept" prong, the '322 patent claims cannot be distinguished

7  from the claims found patent eligible in *DDR Holdings*.  Indeed, MobileIron offers no reasoned

8  explanation of how the *DDR Holdings* claim limitations, taken together as an ordered

9  combination, recites an "inventive concept"—automating the creation of a composite web page by

10  an "outsource provider" (using elements undisputedly known in the art)—but the '322 patent

11  claims do not.  To the contrary, MobleIron's footnoted assertion that, unlike the claims in *DDR*

12  *Holdings*, the '322 patent lacks any "process . . . that 'overrides the routine and conventional

13  sequence of events' that one would expect from operating a computer," (Mot. at 13 n.74) not only

14  lacks any support, but conflicts with both the patent's specification and this Court's constructions.

15  MobileIron's mere assertion that that the '322 patent somehow recites "routine and conventional"

16  steps expected from operating a computer cannot satisfy its burden of proving that the '322 patent

17  is invalid.

18      Indeed, MobileIron's motion amounts to nothing more than a recitation of limitations in

19  the asserted claims followed by a conclusory statement that a limitation is "pre-solution activity,"

20  "natural and obvious," "well-known," "routine," or "non-transformative detail."  (Mot. at 12-14.)

21  MobileIron's conclusory characterizations of the limitations are not persuasive, much less

22  dispositive, in determining whether the limitations alone, or in an ordered combination, amounts

23  to more than any abstract idea embodied in the invention. *See Modern Telecom Sys. LLC v. Juno*

24  *Online Servs.*, 2015 U.S. Dist. LEXIS 33835 at *20-21 (C.D. Cal. Mar. 17, 2015) (holding that a

25  similarly conclusory recitation of claim limitations could not satisfy the burden of proving

26  invalidity).  Even then, MobileIron completely omits discussion of the compatibility matrix

27  limitation in claim 7, and the software policy rules and compatibility matrix limitations of claims 1

28  and 12.

In sum, the claims of the '322 patent are both technical in nature and much closer in scope to those upheld in *Modern Telecom* and *DDR Holdings* than the software-implemented business method patents rejected in *Alice*, *Ultramercial*, *buySAFE*, and *Bankcorp*. Just as in *Modern Telecom* and *DDR Holdings*, MobileIron has utterly failed to prove that the '322 patent's claims, as construed by the Court, cover conventional activity long known in the wireless arts, as opposed to a solution to a wireless networking problem "necessarily rooted in computer technology in order to overcome a problem arising in the realm of [wireless] networks." *DDR Holdings*, 773 F.3d at 1257; *Modern Telecom Sys. LLC v. Juno Online Servs.*, 2015 U.S. Dist. LEXIS 33835 at *21-24.

## V.   CONCLUSION

For the foregoing reasons, MobileIron's motion should be denied.

Dated: April 7, 2015                              Respectfully submitted,

By:  */s/ Lawrence M. Hadley*
Courtland L. Reichman (SBN 268873)
MCKOOL SMITH HENNIGAN, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065
650.394.1400 Telephone
650.394.1422 Facsimile

Lawrence M. Hadley (SBN 157728)
MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa Street, Suite 2900
Los Angeles, CA 90017
213.694.1200 Telephone
213.694.1234 Facsimile

MCKOOL SMITH HENNIGAN, P.C.
REDWOOD SHORES, CA

15   OPP. TO MOT. FOR JUDGMT ON THE PLEADINGS
Case No. 12-CV-05826-PSG

McKool 1086085v1

Steven J. Pollinger (pro hac vice)
Craig N. Tolliver (*pro hac vice*)
Geoffrey L. Smith (*pro hac vice*)
Trent E. Campione (SBN 200273)
MCKOOL SMITH, P.C.
300 West 6th Street, Suite 1700
Austin, TX 78701
512.692.8700 Telephone
512.692.8744 Facsimile

Robert J. Muller (SBN 189651)
Douglas P. Roy (SBN 241607)
CYPRESS LLP
11111 Santa Monica Blvd., Suite 500
Los Angeles, CA 90025
424.901.0123 Telephone
424.750.5100 Facsimile

**Attorneys for Plaintiffs**
**Good Technology Corporation and**
**Good Technology Software, Inc.**