UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GOOD TECHNOLOGY CORPORATION and GOOD TECHNOLOGY SOFTWARE, INC., <br><br>          Plaintiffs, <br>  v. <br>MOBILEIRON, INC., <br><br>          Defendant. | Case No. 5:12-cv-05826-PSG <br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ON LOST PROFIT DAMAGES** <br><br>**(Re: Docket No. 197)** |

"To prevent the hypothetical from lapsing into pure speculation, [the] court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture."[1] Claiming such a lapse in this case, Defendant MobileIron, Inc. moves for summary judgment on Plaintiffs Good Technology Corporation and Good Technology Software, Inc.'s lost profit damages theory. Because the court agrees that Good's evidence of demand in particular fails as a matter of law, the motion is GRANTED.

**I.**

This is a case about technologies for managing data on a mobile device.[2] The MDM market emerged in the late 2000s as mobile devices with disparate operating systems were

---

[1] *Grain Processing Corp. v. Am. Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).

[2] *See* Docket No. 32 at ¶ 2.

1
Case Nos. 5:12-cv-05826-PSG
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ON LOST PROFIT DAMAGES

proliferating in the enterprise.[3]  In 2011, the market research firm Gartner Group described MDM as "a range of products and services that enables organizations to deploy and support corporate applications to mobile devices, such as smartphones and tablets, possibly for personal use— enforcing polices and maintaining the desired level of IT control across multiple platforms."[4] Today, MDM has given way to a new generation of software referred to as Enterprise Mobility Management.  EMM is regarded as "an evolution from previous-generation mobile device management products" and further comprises Mobile Application Management and Mobile Content Management.[5]

Gartner has grouped MDM and EMM products into two broad categories: "Lightweight" and "Heavyweight," and characterizes these approaches as follows:

> **Lightweight approach**: Server-side product or service offerings may have a small mobile agent running on the device, and/or call native APIs provided by the mobile OS platform (e.g., iOS 4), but do not have a complete mobile management client. They can enforce policies on the server side, but cannot control the device and mobile user behavior in depth. […] [T]hey can preserve the native email client experience on iPhones and iPads, which are favorite choices for users.
>
> **Heavyweight approach**: Client-side management software is available for every relevant mobile OS platform (either stand-alone or blended with a proprietary email client). The management client can enforce strong IT control on the device (e.g., local data encryption, selective wipe and containerization). Vendors with this approach are Good Technology, Excitor and Sybase. Good's product does not integrate with the email server's native mobile support (e.g., EAS) – actually, it replaces it, and it does not work with the device's native email client, but requires its own client, which can only connect to a corporate email server. Good Technology's approach prioritizes on IT control, limiting the user's choice and experience with the email client.[6]

Good owns U.S. Patent Nos. 6,151,606, 7,702,322, 7,970,386 and 8,012,219.[7]  The '606 patent teaches disabling access to data on a mobile device after the user has finished using the data.[8]  The '219 patent teaches a server system that can be used to prevent access to data stored on

---

[3] Docket No. 199-9, Exh. 1.

[4] Docket No. 199-10, Exh. 2 at 3.

[5] Docket No. 199-14, Exh. 5.

[6] Docket No. 199-10, Exh. 2.

[7] *See* Docket No. 32 at ¶¶ 18-21.

[8] *See* Docket Nos. 32-1, 32-2.

a mobile device through encryption or deletion.[9] The '386 patent teaches a rules engine on a wireless device that can receive a set of rules from a server and execute the set of rules so as to monitor and take action on the wireless device based on policies.[10] The '322 patent teaches distribution of software updates for wireless devices that are governed by customer-defined software policies and communicated over the internet.[11] Good's products include Good for Enterprise, Good for Government, Good Dynamics, BoxTone and AppCentral.[12]

MobileIron is an enterprise mobility management solutions provider that enables companies to secure, control and manage mobile devices, mobile apps and mobile content. MobileIron owns U.S. Patent No. 8,359,016, which teaches filtering a catalog of mobile device applications based on a set of policies applied to a user profile and a mobile device profile to select a set of applications to return to the user.[13]

MobileIron offers two EMM solutions: MobileIron Core and MobileIron Cloud. MobileIron Core is comprised of three primary components: the Core server, the Sentry server and the Mobile@Work client. The Core server enables IT administrators to define security policies and to take actions upon mobile devices, apps and content. Sentry is a gateway server that manages and secures network traffic between the mobile devices and corporate systems, such as email and document repository servers. The Mobile@Work client is installed on the mobile device, enforces the security policies received from the Core server and also sends device information back to the Core server.

MobileIron Cloud is MobileIron's cloud-based EMM solution and also has three main software components. The MobileIron Cloud server is the central location from which security policies and actions are defined and implemented. MobileIron Cloud also includes a Sentry

---

[9] *See* Docket No. 32-5.

[10] *See* Docket No. 32-4.

[11] *See* Docket No. 32-3.

[12] AppCentral is a product that allows companies to distribute mobile applications to their users. *See* Docket No. 191-10.

[13] *See* Docket No. 41 at 10.

1  gateway server that manages network traffic between the mobile devices and corporate systems.
2  MobileIron Go, the client software, is installed on the mobile device, enforces security policies
3  received from the MobileIron Cloud server and also sends device information back to the
4  MobileIron Cloud server.  MobileIron also offers other various products and features such as
5  standalone products such as Docs@Work, Apps@Work, AppConnect and Email+.[14]  In contrast to
6  Good's products, MobileIron's products are considered "lightweight" in that they secure the
7  smartphone platform by integrating with the application programming interfaces of the mobile
8  device's operating system.[15]  This approach allows a user of MobileIron's products to use the
9  familiar "native" apps of the smartphone.[16]

In late 2012, Good sued MobileIron alleging both infringement of the '606, '322, '386 and '219 patents and violations of the Lanham Act and California Business and Professions Code Section 17200.[17]  In addition to a reasonable royalty, Good seeks lost profits as its damages.[18] Good's damages expert, Roy Weinstein, identifies 103 separate MobileIron SKUs (stock keeping units) as accused products and presents four separate lost profit scenarios in his report.  In the first two scenarios, Weinstein opines that 100 percent of the sales for the accused product bundles and software suites should be awarded to Good because "Good is not aware of any competitors offering non-infringing alternatives."[19]  He multiplies the total number of units sold for the accused SKUs against Good's average selling price for Good for Enterprise and Good Mobile Manager.[20]  In the

---

[14] *See* Docket No. 219-5 at 3.

[15] Docket No. 199-10, Exh. 2; Docket No. 199-15, Exh. 8.

[16] Docket No. 199-10, Exh. 2.

[17] MobileIron later counterclaimed, alleging that Good's AppCentral product infringes MobileIron's '016 patent.  *See* Docket No. 41.

[18] Good's reasonable royalty damages theory is not at issue in the pending motion.

[19] Docket No. 199-16 , Exh. 9 at 54.

[20] *See* Docket No. 199-16, Exh. 9.

third and fourth scenarios, he awards 16.4 percent of MobileIron's accused sales to Good using the same calculation method described above.[21]

## II.

This court has subject matter jurisdiction pursuant to 15 U.S.C. § 1125 and 28 U.S.C. §1367. The parties further consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. §636(c) and Fed. R. Civ. P. 72(a).

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Material facts are those that may affect the outcome of the case.[22] A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.[23] All evidence must be viewed in the light most favorable to the non-moving party. At this stage, a court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial."[24] Initially, the moving party bears the burden to show that no genuine issue of material fact exists.[25] If this burden is met, the burden shifts to the non-moving party.[26]

## III.

The availability of lost profits is a question of law that may be resolved on summary judgment.[27] To recover lost profits, a patentee is required to put forward "sound economic proof of

---

[21] *See id.*

[22] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

[23] *See id.*

[24] *House v. Bell*, 547 U.S. 518, 559-60 (2006).

[25] *See Celotex Corp. v. Caltrett*, 477 U.S. 317, 323-24 (1986).

[26] *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 630, 630 (9th Cir. 1987).

[27] *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1365 (Fed. Cir. 2008) (availability of lost profits is a question of law) (citing *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1121 (Fed. Cir. 2003)); *see also Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007); *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004). To be sure, much of MobileIron's challenge focuses on the sufficiency of Weinstein's testimony, and the Federal

the nature of the market and likely outcomes with infringement factored out of the economic picture."[28] The *Panduit* test provides a common, but non-exclusive method for showing "but for" causation where a patentee must prove, among other things, demand for the patented product.[29] Because Good offers insufficient evidence to meet this key *Panduit* requirement, and offers no other alternative method, no reasonable jury could award Good the lost profits that it seeks.

*First*, no reasonable jury could find that Good satisfies the entire market value rule. The Federal Circuit recently confirmed that the EMVR applies to lost profits claims.[30] The EMVR requires that where damages are based on sales of a multicomponent product that includes both infringing and non-accused components, in the absence of an apportionment, a patentee must prove that the patented features are the primary driver of demand for the entire product.[31] "To employ the entire market value rule, plaintiffs first must show that the infringing feature is the primary reason that consumers buy the product."[32] Notably, the Federal Circuit has emphasized that "[i]t is

---

Circuit has made clear that expert testimony should be addressed by a challenge under Fed. R. Evid. 702. *See Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013). But Good does not raise any procedural objection to the present motion. Any such objection therefore is waived.

[28] *Wechsler*, 486 F.3d at 1293 (Fed. Cir. 2007); s*ee also Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc).

[29] *See Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1372-73 (Fed. Cir. 1991); *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).

[30] *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (holding that unless demand driven by patented features "apportionment is required even for non-royalty forms of damages: a jury must ultimately 'apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features' using 'reliable and tangible' evidence" (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

[31] *See Ericsson, Inc.*, 773 F.3d at 1226; *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); s*ee also Seymour v. McCormick*, 57 U.S. 480, 491 (1853) (explaining that it is "grave error" to instruct a jury that damages may be awarded for an entire machine for infringement of a patent that covers only an improvement to the machine.); *Garretson*, 111 U.S. at 121 (requiring a patentee to "separate or apportion" profits between patented and unpatented features or to show that "the entire value of the whole machines … is properly and legally attributable to the patented feature.").

[32] *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, Case No. 10-cv-03428, 2013 U.S. Dist. LEXIS 8113, at *50 (N.D. Cal. Jan. 10, 2013); *see also Ericsson, Inc.*, 773 F.3d at 1226; *VirnetX, Inc.*, 767 F.3d at 1326.

not enough to merely show that the [patented feature] is viewed as valuable, important or even essential to the use of the [entire accused product.]"[33]  The more essential inquiry, rather, is whether the plaintiff can show that each or any of the patented features "creates the basis for customer[] demand."[34]

Here, Weinstein relies on the entire value of the 103 MobileIron SKUs that Good accuses, but fails to apportion or show that the basis of demand for those SKUs is any individual patented feature.[35]  If anything, the evidence is undisputed that multiple features, including features that have nothing to do with the patents, drive demand for the accused products.  Among these unpatented features driving demand are lightweight, native experience[36] and price.[37]  The very industry reports Weinstein himself relies on confirm this.[38]  Evidence that customers would not have purchased MobileIron products if they did not practice the patents-in-suit is insufficient because no evidence suggests that any patented feature was the primary reason customers

---

[33] *LaserDynamics, Inc., v. Quanta Computers, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012) ("It is not enough to merely show that the disc discrimination method is viewed as valuable, important, or even essential to the use of the laptop computer.  Nor is it enough to show that a laptop computer without an ODD practicing the disc discrimination method would be commercially unviable.  Were this sufficient, a plethora of features of a laptop computer could be deemed to drive demand for the entire product.").

[34] *VirnetX, Inc.*, 767 F.3d at 1326.  In most cases, demand for the entire apparatus is not interchangeable with demand for a patented component of the larger apparatus.  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337–38 (Fed. Cir. 2009).

[35] *See* Docket No. 199-17, Exh. 12 at 54.

[36] *See* Docket No. 199-10, Exh. 2 at 2 (MobileIron's "Lightweight approach" provides the ability to "preserve the native email client experience on iPhones and iPads, which are favorite choices for users.").

[37] *See id.* at 52, 57, 59, 136 (indicating that there are multiple drivers of demand, some of which are not related to Good's patents, that price and "native experience" were drivers of demand for some consumers and that Gartner identifies patented features as one of multiple drivers of demand).

[38] *See id.* at 2 (MobileIron's "Lightweight approach" provides the ability to "preserve the native email client experience on iPhones and iPads, which are favorite choices for users."); Docket Nos. 198-2, 198-3, Exh. 6 at 12 (attributing MobileIron's success to striking "the right balance between security and usability," and providing for a "modular and extendable platform.").

purchased infringing product.  "It is not enough to merely show that the [patented feature] is viewed as valuable, important or even essential to the use of the [entire accused product]."[39]

Weinstein's analysis also violates the EMVR by not apportioning Good's lost profits across the four asserted patents.  In *Beauregard v. Mega Sys., LLC*, the Federal Circuit found reversible error in just such a circumstance.  The district court based its lost profits award on evidence of sales of a device embodying features in addition to those present in one infringed patent, namely, those features attributable to a second infringed patent.[40]  "The district court therefore failed to distinguish the allocation of profits that would have been made 'but for' the infringement of the '376 patent with the profits that could fairly be allocated to customer demand related to the features embodying the '991 patent."[41]

Good tries to get around this problem by arguing that its products work together as a "single functioning unit," thereby obviating the need to apportion.  But even if Good offered competent technical evidence on the subject—which it does not[42]—Good would still need to show that the patented features drove demand,[43] which it simply has not done.  Good maintains that because the patented features were part of the set of minimum requirements for the products to function at all, they must have been the primary driver of demand.[44]  But as discussed above, the evidence shows

---

[39] *LaserDynamics, Inc.*, 694 F.3d at 67.

[40] *Ferguson Beauregard v. Mega Sys., LLC*, 350 F.3d 1327, 1345-46 (Fed. Cir. 2003).

[41] *Id.* at 1346.

[42] As a damages expert, Weinstein is not competent to offer any such opinion.  Good's other cited materials lack any evidence to show that the patented and unpatented features are analogous to components of a single assembly, or function together so as to produce a desired end product or result.  *Cf. Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1361 (Fed. Cir. 2001).  In any event, Good admits that they are, in fact, sold independently of each other.  *See* Docket No. 235 at 10.  *Cf. Imonex Servs. v. W.H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d 1374, 1379 (Fed. Cir. 2005).

[43] *See Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009) (Rader, J.,) (holding that the EMVR requires adequate proof that (1) the infringing components must be the basis for customer demand for the entire machine; (2) the individual infringing and non-infringing components must be sold together so that they constitute a functional unit or are parts of a complete machine or single assembly of parts and (3) the individual infringing and non-infringing components must be analogous to a single functioning unit, and noting that the requirements are additive, not alternative).

[44] *See* Docket No. 236-4 at 11-12.

that customers considered additional aspects such as the availability of native email clients and price when choosing which product to purchase.[45]

Nor is it any help to Good to argue that MobileIron has not shown that Good used something other than the smallest saleable unit in its lost profits analysis. The burden is the other way around, such that Good must show that Weinstein's analysis used the smallest saleable unit.[46] Instead, Weinstein testified that he performed no such analysis.[47]

***Second***, Weinstein's demand analysis does not account for market elasticity. The Federal Circuit has held that "in a credible economic analysis, the patentee cannot show entitlement to a higher price divorced from the effect of that higher price on demand for the product."[48] In constructing a hypothetical "but for" market for the purposes of a lost profits analysis, "[a]ll markets must respect the law of demand," which counsels that "consumers almost always purchase fewer units of a product at a higher price than at a lower price, possibly substituting other products."[49] The undisputed record shows that during the relevant period Good's product prices were between 194% to 819% higher than MobileIron's. Weinstein nevertheless assumes that Good's products are perfect substitutes for MobileIron's products, thereby allowing all MobileIron sales to be attributed to Good. Critically, he did no serious investigation—no empirical study, no survey, nothing— to evaluate the validity of his assumption. His only attempt was to talk to a Good vice president of product management, who offered only that Good would have the "ability"

---

[45] *See* Docket No. 199-17, Exh. 12 at 52, 57, 59, 136.

[46] *See Golden Bridge Tech. v. Apple Inc.*, Case No. 12-cv-04882, 2014 U.S. Dist. LEXIS 68564, at *10, *17-18 (N.D. Cal. May 18, 2014).

[47] *See* Docket No. 265-6, Exh. 35 at 131:19-22, 132:5-8 ("Q: Do you know what the smallest saleable component is that MobileIron sells that practices the patents-in-suit? A: I can't say.") ("Q: And do you know what the small[est] saleable component is that Good sells that practices the patents-in-suit? A: I don't.").

[48] *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001).

[49] *Id.* at 1359; *Bic Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1218 (Fed. Cir. 1993).

to "make sales at higher prices that were lost to MobileIron at lower prices."[50] This falls far short of the "sound economic proof" required.

In *Bic Leisure Prods. v. Windsurfing Int'l*, the Federal Circuit held that where the price disparity between the infringer's products and the patentee's products was only 73 percent, the disparity was enough to dispel the notion that the patentee would have been able to capture all of the infringer's sales, ultimately leading to reversal of the lower court's lost profits award.[51] Here, the price disparity between Good's products and MobileIron's products is far greater, and customer testimony is clear that price sensitivity was a key concern in choosing a product.[52] Even Good's own SEC filing confirms that price is among the factors driving demand.[53] Based on the significant price differentials, it is untenable to assume or suggest—without providing any evidence—that consumers would ever consider Good and MobileIron to be perfect substitutes.

Weinstein's analysis similarly fails to account for the substantial differences in features between Good and MobileIron's products. To recover "lost profits based on the infringer's sales, a patentee must show that the infringing units do 'not have a disparately higher price than or possess characteristics significantly different from the [patentee's product].'"[54] In *Bic Leisure*, the Federal Circuit explained that a patentee could not claim lost profits on its market share without first showing that the infringer sold substantially similar products.[55] In so holding, the court observed

---

[50] Docket No. 199-17, Exh. 12 at 35.

[51] *Bic Leisure Prods.*, 1 F.3d at 1218.

[52] *See, e.g.*, Docket No. 198-4, Exh. 15 at 52:2-9, 52:11-17 ("price was a consideration . . . I do recall that one of our findings was that the Sybase and Good Technology solutions were more expensive than what we were looking at through MobileIron.") ("the fact that MobileIron had the lowest price" was one of the factors that "contributed to Nordstrom's decision to purchase MobileIron."); Docket No. 199-18, Exh. 16 at 50:25-51:3, 55:3-6 (customer would not have purchased MobileIron's products "if they were substantially more expensive."); Docket No. 198-4, Exh. 17 at 36:8-9, 36:16-24, 37:3-6 (did not consider purchasing Good and "opted to go with MobileIron over [the others] because MobileIron ha[s] a better price."); Docket No. 198-4, Exh. 18 at 50:9-51:1 (pricing was one of two "key factors" in decision to purchase MobileIron over Good); Docket No. 199-19, Exh. 19 at 43:8-15, 49:7-13 ("the reason that MobileIron was chosen over Good was due to pricing and due to the technology limitations at the time that Good had.").

[53] *See* Docket No. 198-4, Exh. 7 at 20.

[54] *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991) (citations omitted).

[55] *See Bic Leisure Prods.*, 1 F.3d at 1219.

that "during the damages period the sailboard market was not a unitary market in which every competitor sold substantially the same product."[56]

The facts here are similar to those of *Bic Leisure*. Gartner characterized the enterprise MDM market as having "60 players with a wide range of product, services, and capabilities."[57] Moreover, Garner expressly distinguished between MobileIron's "Lightweight," server-side products offering a native experience and Good's "Heavyweight," client-side software.[58] These substantial dissimilarities between MobileIron's and Good's products are further established by testimony from MobileIron's customers.[59]

In stark contrast, Good puts forth no evidence to support the assertion that customers of MobileIron's Lightweight MDM product would have been willing to purchase Good's significantly different MDM products had MobileIron exited the market. And Good's damages expert provides no insight. When asked in deposition if he had spoken with his contact at Good about whether Good's and MobileIron's product characteristics were similar or different, Weinstein responded that he had not because "[i]t wasn't necessary. We just didn't cover that aspect of it."[60] Nor did Weinstein speak with Good's technical expert, Hugh Smith, regarding the dissimilar characteristics

---

[56] *Id.*

[57] Docket No. 199-10, Exh. 2 at 2.

[58] *Id.* at 2-3.

[59] *See* Docket No. 198-5, Exh. 21 at 52:13-21 ("it was our interpretation that [Good] required use of their email client on all of the devices and at least seemed to require it to have the access to the bulk of the feature set, and that was really something we did not wish to, from a functional standpoint, wish to consider. So I guess you could say we looked at it very high level, and that factor made the product nonviable for us."); Docket No. 199-18, Exh. 16 at 54:24-55:2 (customer would not have purchased MobileIron's products if they did not offer a native user experience); Docket No. 198-5, Exh. 22 at 54:1-5 (when asked "[w]hen you were assessing MDM products, were you looking for a product that provided a containerized e-mail application?" responded "No, we weren't."); Docket No. 198-5, Exh. 23 at 35:11-15 (choosing MobileIron over Good primarily because of "the use of the Apple native mail app. as opposed to using a Good application to access e-mail."); Docket No. 198-4, Exh. 15 at 42:2-5, 44:9-14 ("[t]he requirement at the time when we were doing this evaluation was that it had to use the native UI for e-mail . . . Good and Sybase used a containerized platform for delivering those applications, and again, we really wanted to stick with the native UI offered by the iOS, and so that was a big consideration with not going with one of those products."); Docket No. 198-5, Exh. 24 at 40:1 ("[w]e did not want a containerized solution.").

[60] Docket No. 199-17, Exh. 12 at 23-24.

11
Case Nos. 5:12-cv-05826-PSG
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ON LOST PROFIT DAMAGES

of Good's and MobileIron's respective products.[61]  Weinstein eventually admitted that GFE had different characteristics from the MobileIron products that he had identified as lost sales.[62] Moreover, Weinstein conceded that "if there were customers who resisted a containerized approach, MobileIron customer, it could affect the 100 percent computation."[63]  The evidence in the record, including testimony from MobileIron's customers, establishes that Good's containerized approach is a significant and differentiating characteristic from the native experience of MobileIron's MDM offering.

The best Good can do is to point to the Gartner Group Magic Quadrant for Mobile Device Management Software to show that Good and MobileIron are competitors in the same market segment.[64]  But simply because Good and MobileIron compete in the same arena and often compete for some share of their customer base, does not require a conclusion that their products are substitutable and that any MobileIron customer would have purchased a Good product if MobileIron's product was not available.  If Weinstein had investigated what portion of MobileIron customers may have ultimately purchased Good in such a scenario and based his lost profits analysis on those numbers, this might be a different story.  But on this record there is simply no factual or logical basis for allowing lost profits calculations on MobileIron's entire market share.[65]

## IV.

MobileIron's motion for summary judgment on lost profits damages is GRANTED.

**SO ORDERED.**

Dated: June 23, 2015

*Paul S. Grewal*
PAUL S. GREWAL
United States Magistrate Judge

---

[61] *Id.* at 29-30.

[62] *Id.* at 90-91.

[63] *Id.* at 110.

[64] *See* Docket Nos. 199-20, 199-21, 199-22.

[65] The court does not reach MobileIron's separate challenges to the sufficiency of Good's evidence regarding *Panduit* factors 2 and 3.