UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GOOD TECHNOLOGY CORPORATION and GOOD TECHNOLOGY SOFTWARE, INC., <br><br> Plaintiffs, <br> v. <br><br> MOBILEIRON, INC., <br><br> Defendant. | Case No. 5:12-cv-05826-PSG <br><br> **ORDER GRANTING-IN-PART MOTION TO EXCLUDE TESTIMONY** <br><br> **(Re: Docket No. 294)** |

From all the chatter about the Federal Circuit's guidance in recent years on the entire market value rule, you'd think the court had unveiled a completely new framework for assessing patent damages from products with both infringing and non-infringing features. While providing much appreciated clarification, a careful inspection of *Lucent, LaserDynamics, VirnetX* and the rest shows the basic methodological rule for expert analysis remains the same: calculate the value of those features that infringe, and cut out the value of all the rest. The Supreme Court essentially said the same thing in *Garretson* in 1884.[1] But as this case illustrates, this longstanding patent damages principle continues to be ignored in too many patent cases.

---

[1] *See Garretson v. Clark*, 111 U.S. 120, 121 (1884) ("The patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative, or he must show by equally reliable and satisfactory evidence that the profits and damages are to be calculated on the whole machine, as a marketable article, is properly and legally attributable to the patented feature.").

Convinced that Plaintiffs Good Technology Corporation and Good Technology Software, Inc.'s damages expert, Roy Weinstein, fails this longstanding test, and others, Defendant MobileIron, Inc. moves to exclude certain of his opinions from the upcoming trial. MobileIron also seeks to exclude certain opinions of Good's technical expert Hugh Smith. Recognizing its responsibility to keep methodologically unsound opinion testimony from the jury, while being "cautious not to overstep its gatekeeping role and weigh facts,"[2] the court agrees that certain expert opinions should not be presented to the jury: Weinstein's first, second and fourth royalty scenarios for MobileIron's alleged infringement, his opinion regarding damages for Good's alleged infringement and Smith's disputed opinions.

**I.**

Despite significant reforms in the America Invents Act of 2011, the key damages provision remains. As before, 35 U.S.C. § 284 provides that upon "finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." The goal of the damages award is not to punish the infringer, but rather to make the patentee whole by ascertaining what the patent holder would have made had the infringer not infringed.[3] Damages may take the form of "reasonable royalty [the patentee] would have received through arms-length bargaining" in a hypothetical negotiation.[4] The hypothetical negotiation approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."[5]

Good develops and sells mobile data and device management technologies.[6] Good owns United States Patent Nos. 6,151,606, 7,702,322, 7,970,386 and 8,012,219.[7] The '606 patent

---

[22] *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014).

[3] *Id.* (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964)).

[4] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[5] *Id.*

[6] *See* Docket No. 32 at ¶ 2.

teaches disabling access to data on a mobile device after the user has finished using the data.[8] The '219 patent teaches a server system that can be used to prevent access to data stored on a mobile device through encryption or deletion.[9] The '386 patent teaches a rules engine on a wireless device that can receive a set of rules from a server and execute the set of rules so as to monitor and take action on the wireless device based on policies.[10] The '322 patent teaches distribution of software updates for wireless devices that are governed by customer-defined software policies and communicated over the internet.[11] Good's products include Good for Enterprise, Good for Government, Good Dynamics, BoxTone and AppCentral.[12]

MobileIron is an enterprise mobility management solutions provider, which enables companies to secure, control and manage mobile devices, mobile apps and mobile content. MobileIron owns United States Patent No. 8,359,016, which teaches filtering a catalog of mobile device applications based on a set of policies applied to a user profile and a mobile device profile to select a set of applications to return to the user.[13]

MobileIron offers two EMM solutions: MobileIron Core and MobileIron Cloud. MobileIron Core is comprised of three primary components: the Core server, the Sentry server and the Mobile@Work client. The Core server enables IT administrators to define security policies and to take actions upon mobile devices, apps and content. Sentry is a gateway server that manages and secures network traffic between the mobile devices and corporate systems, such as email and document repository servers. The Mobile@Work client is installed on the mobile device, enforces

---

[7] *See id.* at ¶¶ 18-21.

[8] *See* Docket Nos. 32-1, 32-2. The court previously ruled that the '606 patent is neither valid nor infringed by the accused MobileIron products. *See* Docket No. 424.

[9] *See* Docket No. 32-5.

[10] *See* Docket No. 32-4.

[11] *See* Docket No. 32-3.

[12] *See* Docket No. 191-10.

[13] *See* Docket No. 41 at 10.

3
Case Nos. 5:12-cv-05826-PSG
ORDER GRANTING-IN-PART MOTION TO EXCLUDE TESTIMONY

the security policies received from the Core server and also sends device information back to the Core server.

MobileIron Cloud is MobileIron's cloud-based EMM solution and also has three main software components. The MobileIron Cloud server is the central location from which security policies and actions are defined and implemented. MobileIron Cloud also includes a Sentry gateway server that manages network traffic between the mobile devices and corporate systems. MobileIron Go, the client software, is installed on the mobile device, enforces security policies received from the MobileIron Cloud server and also sends device information back to the MobileIron Cloud server. MobileIron also offers other various products and features such as Docs@Work, Apps@Work, AppConnect and Email+.[14]

In late 2012, Good sued MobileIron alleging both infringement of the '606, '322, '386 and '219 patents and violations of the Lanham Act and California Business and Professions Code Section 17200.[15] To support its claims for damages arising from MobileIron's alleged infringement, Good disclosed proposed opinion testimony from Roy Weinstein.[16] Weinstein includes estimates in what he calls four alternative reasonable royalty "scenarios" that focus on 103 MobileIron Core and Cloud SKUs (stock keeping units).[17] Each of these SKUs includes at least the accused MDM and app store functionality, referred to now by MobileIron as EMM Silver and previously as Advanced Management. Although MobileIron's sales sheets do not identify any smaller portions of Advanced Management offered for sale,[18] Advanced Management includes many features not accused of infringement in this case, including Atlas (reporting), Security

---

[14] *See* Docket No. 219-5 at 3.

[15] MobileIron counterclaimed, alleging that Good's AppCentral product infringes MobileIron's '016 patent.

[16] *See* Docket No. 199-16, Exh. 9 at ¶ 4.

[17] *See* Docket No. 199-17, Exh. 13. Weinstein also offers two scenarios of Good's lost profits from MobileIron's alleged infringement. In addition, Weinstein also opines on the reasonable royalty Good would owe MobileIron for Good's alleged infringement of MobileIron's '016 patent. Weinstein concluded that Good would agree to pay, at most, 50 percent of the profits from its accused sales. *See* Docket No. 293-34, Exh. 21 at ¶ 154.

[18] *See* Docket No. 293-11, Exh. 5 at Exh. 2.

(certificate management feature) and Enterprise Integration (application program interface feature).[19]

In Weinstein's first royalty scenario, he calculates the royalty rate by taking the weighted average selling price of Advanced Management products and multiplying it by 100 percent of MobileIron's weighted profit margin.[20] This produces a royalty rate per accused perpetual license and per accused subscription license.[21] For the royalty base, Weinstein adds the number of licenses for Advanced Management to the number of licenses for product bundles including Advanced Management.[22] Multiplying the rate and the base produces a total royalty amount.[23]

Weinstein's second royalty scenario alternatively estimates that Good would only be able to negotiate for 30 percent of MobileIron's weighted profit margin.[24] Here, Weinstein reasons that the parties would agree to a profit split that reflects the "relative importance of the accused functionality"[25] within Advanced Management. He begins his profit split calculation with the Nash Bargaining Solution,[26] in which Good and MobileIron negotiate a 50/50 profit split.[27] He then adjusts this split by measuring the relative importance of the patents-in-suit using the Gartner Magic Quadrant for 2011 and Gartner's 2011 Critical Capabilities for Mobile Device Management. In these industry reports, Gartner lists ten criteria necessary for any MDM product to compete in the market.[28] After determining the functionality of Good's patents-in-suit covers at least three of

---

[19] *Id.* at ¶¶ 62-68.

[20] *See id.* at ¶ 257 n.366.

[21] *See id.* at ¶ 256.

[22] *See id.* at ¶ 238.

[23] *See id.* at Exh. 13.

[24] *See id.* at ¶¶ 259, 264.

[25] *See id.* at ¶ 259.

[26] *Id.*

[27] *See id.* at ¶ 112.

[28] *See id.* at ¶ 261.

5
Case Nos. 5:12-cv-05826-PSG
ORDER GRANTING-IN-PART MOTION TO EXCLUDE TESTIMONY

those categories,[29] Weinstein adjusts the profit split so that Good received 30 percent of the profits.[30] The royalty base is the same as in Weinstein's first royalty scenario.

Weinstein's third royalty scenario is a slight modification of his first scenario. In this third scenario, Good only receives 18.75 percent of the profits associated with MobileIron's accused sales.[31] To calculate this royalty rate, Weinstein assumes MobileIron only infringes the '322 patent.[32] He then treats MobileIron's a pp store as the smallest MobileIron product that infringes the '322 patent.[33] The app store is not sold by itself—it is part of Advanced Management.[34] To calculate the app store's share of Advanced Management's value, Weinstein considers MobileIron's offering of a cheaper version of Advanced Management that lacked the app store and Sentry.[35] Weinstein takes the price differential between the two versions and splits the difference between the app store and Sentry to arrive at a per unit valuation of the app store of 18.75 percent.[36] Weinstein takes that fraction of his first royalty scenario amount to produce a royalty amount for this third scenario.[37]

Weinstein's fourth royalty scenario is a slight modification of his second scenario. As in method three, Weinstein assumes MobileIron only infringes the '322 patent.[38] Using the same valuation of the app store, he took 18.75 percent of his second scenario amount to arrive at his fourth royalty amount.[39]

---

[29] *Id.*

[30] *See id.* at ¶ 264.

[31] *See id.* at ¶ 256 n.365.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *See id.* at ¶ 256 n.365, Exh. 13b.

[38] *See id.* at ¶ 256 n.365, Exh. 13C.

[39] *Id.*

6
Case Nos. 5:12-cv-05826-PSG
ORDER GRANTING-IN-PART MOTION TO EXCLUDE TESTIMONY

Good's technical expert, Hugh Smith, opines on the willfulness of MobileIron's alleged infringement and the commercial acceptability of proposed non-infringing alternatives. The part of his report at issue identifies a variety of actions MobileIron takes to provide its customers with allegedly infringing software.[40] Smith interprets these actions as revealing intent to engage in them.[41] Elsewhere in his report, Smith assessed design arounds for the '219 patent proposed by MobileIron's experts.[42] He criticizes the design arounds' negative impact on the software's data security.[43] Based on these perceived flaws, Smith concludes that none of the design arounds are acceptable non-infringing substitutes.[44]

## II.

This court has subject matter jurisdiction pursuant to 15 U.S.C. § 1125 and 28 U.S.C. §1367. The parties further consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. §636(c) and Fed. R. Civ. P. 72(a).

Expert testimony may only be admitted in a manner consistent with the Federal Rules of Evidence, *Daubert*,[45] *Kumho*[46] and more recent appellate court progeny.[47] Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will help "the trier of fact to understand the evidence or to determine a fact in

---

[40] These actions include providing customers with allegedly infringing software, instructing customers on installation and instructing customers how to use the software. *See* Docket No. 293-17, Exh. 9 at ¶¶ 310-14.

[41] *Id.*

[42] *See id.* at ¶¶ 61-66.

[43] *See id.* at ¶ 64.

[44] *See id.* at ¶ 61.

[45] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[46] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

[47] *See, e.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014).

issue."[48] When considering expert testimony, the trial court serves "as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards."[49]

An expert witness may provide opinion testimony if: (1) "the testimony is based upon sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods; and" (3) "the expert has reliably applied the principles and methods to the facts of the case."[50]  "Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.'  When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony."[51]  The inquiry into the admissibility of an expert opinion is a "flexible one" where shaky "but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."[52]

A trial court must be sure that its review of expert testimony focuses "solely on principles and methodology, not on the conclusions that they generate."[53]  "A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another.  These tasks are solely reserved for the fact finder."[54]  The Federal Circuit recently

---

[48] *See Daubert*, 509 U.S. at 589.

[49] *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).  A district court's decision to admit expert testimony under *Daubert* in a patent case must follow the law of the regional circuit.  *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003) ("Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit, here the Fifth Circuit.").

[50] Fed. R. Evid. 702; *see also Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008) ("Patent cases, like all other cases, are governed by Rule 702.  There is, of course, no basis for carving out a special rule as to experts in patent cases.").

[51] *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (citing *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

[52] *Id.* at 564 (citing *Daubert*, 509 U.S. at 592-96).

[53] *Daubert*, 509 U.S. at 592-94, 596.

[54] *Apple Inc. v. Motorola, Inc.*, 757 F.3d at 1314.

clarified that this limitation of the gatekeeping role of the judge to the exclusion of "testimony based on unreliable principles and methods is particularly essential in the context of patent damages."[55] This is because "questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'"[56]

### III.

To the extent there was ever a question, the Federal Circuit has made clear several essential elements of a sound patent damages methodology that are ignored in a variety of Weinstein's royalty scenarios. Smith's disputed opinions suffer from other problems.

*First*, Weinstein's first royalty scenario does not sufficiently apportion the royalty base. In *LaserDynamics,* the Federal Circuit "reaffirm[ed] that in any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent-practicing unit, without showing that the demand for the entire product is attributable to the patented feature."[57] To be fair, even though Weinstein's deposition testimony suggests otherwise,[58] Weinstein's analysis does focus on Advanced Management rather than the broader bundles in which it is sold,[59] and Good offers evidence that no smaller unit is available for purchase.[60] But the Federal Circuit requires that Weinstein further apportion to exclude from the

---

[55] *Id.* at 1315.

[56] *Id.* ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.") (citing *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010)).

[57] *LaserDynamics, Inc. v. Quanta Computers, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012); *see also Golden Bridge Tech. v. Apple Inc.*, Case No. 12-cv-04882, 2014 U.S. Dist. LEXIS 68564, at *14-18 (N.D. Cal. May 18, 2014); *Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, Case No. 5:11-cv-05973, 2013 WL 4538210, at *3 (N.D. Cal. Aug. 22, 2013).

[58] Docket No. 293-6, Exh. 1 at 131:19-22 ("Q: Do you know what the smallest saleable component is that MobileIron sells that practices the patents-in-suit? A: I can't say.").

[59] *See* Docket No. 316-8, Exh. 1 at ¶¶ 80-81.

[60] *See id.* at ¶ 81 ("MobileIron's most basic VSP [Virtual Smartphone Platform] bundle is called 'Advanced Management' and includes use of the VSP server component, VSP client component (called Mobile@Work), and an enterprise app store functionality called Apps@Work.").

Advanced Management products the value of unpatented functionalities.[61]  This he plainly fails to do.[62]

Good justifies this omission by arguing alternatively that (1) Sentry has no independent value as a stand-alone product[63] and (2) Weinstein could not calculate any value of Sentry—a component that undisputedly does not infringe—in order to exclude it from the royalty rate because MobileIron failed to provide any information as to its market value.[64]  A patentee may not, however, "hide behind [the defendant's] sales model to avoid the task of apportionment."[65]  Even if it could, Weinstein's own report actually includes opinions on the value of undeniably non-infringing features.  In his second royalty scenario, he attributes no less than 70 percent of the value of Advanced Management to features that do not infringe.[66]  In his third and fourth scenarios, he finds that Sentry—again a functionality that plainly does not infringe—accounts for 18.75 percent of the price of Advanced Management.[67]  As such, his failure to apportion in his first scenario beyond Advanced Management was not methodologically sound.

---

[61] *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014); *see also LaserDynamics*, 694 F.3d at 70.

[62] *See* Docket No. 293-6, Exh. 1 at 58:13-15 ("Q: Did you evaluate whether there were unpatented features in the MobileIron products?  A: I did not.  Q: And did you evaluate or seek guidance from Dr. Smith or Mr. Herrema as to whether there were features in the MobileIron products offering that were unrelated to the patented features? . . . A: No.  Q: Did you seek to isolate or remove the unpatented features in either your reasonable royalty or lost profits calculation?  A: I did not."); *see also id.* at 141:3-10.

[63] Docket No. 316-8, Exh. 1 at ¶ 84 ("The device is also able to communicate with backend content repositories . . . through the MobileIron Sentry, which is configured using the VSP server."); Docket No. 316-12, Exh. 5 at 72:6-11 (MobileIron's CTO described Sentry as "an inline proxy that works with the instructions from the VSP to allow or not allow certain traffic"); Docket No. 316-11, Exh. 4 at 28:5-10 (MobileIron's Senior VP of sales testified that Sentry is "the traffic c[o]p for your mobile devices accessing the network, the corporate network.").

[64] *See* Docket No. 316-5 at 4.

[65] *VirnetX, Inc.*, 767 F.3d at 1329 (holding that a patentee must be reasonable when seeking to identify a patent-practicing unit with a close relation to the patented feature).

[66] *See* Docket No. 293-11, Exh. 5 at ¶ 261.

[67] *See id.* at 94, n.365.

10
Case Nos. 5:12-cv-05826-PSG
ORDER GRANTING-IN-PART MOTION TO EXCLUDE TESTIMONY

In the absence of any apportionment, the EMVR requires that Weinstein prove that the patented features are the primary driver of demand for the entire Advanced Management product.[68] "To employ the entire market value rule, plaintiffs first must show that the infringing feature is the primary reason that consumers buy the product."[69] Notably, the Federal Circuit has emphasized that "[i]t is not enough to merely show that the [patented feature] is viewed as valuable, important or even essential to the use of the [entire accused product.]"[70] The more essential inquiry, rather, is whether the plaintiff can show that each or any of the patented features "creates the basis for customer[] demand."[71]

Good relies on Gartner reports, customer testimony and MobileIron employee testimony to show that customers would not have purchased the MobileIron products if they did not have the ability to practice the claimed functionality, such as remotely retiring a device or performing application distribution.[72] But these are baseline functionalities of the products at-issue, not drivers of demand for the product as a whole. Weinstein himself admits that there are multiple drivers of

---

[68] *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *VirnetX, Inc.*, 767 F.3d at 1326; s*ee also Seymour v. McCormick*, 57 U.S. 480, 491 (1853) (explaining that it is "grave error" to instruct a jury that damages may be awarded for an entire machine for infringement of a patent that covers only an improvement to the machine.).

[69] *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, Case No. 10-cv-03428, 2013 U.S. Dist. LEXIS 8113, at *50 (N.D. Cal. Jan. 10, 2013); *see also Ericsson, Inc.,* 773 F.3d at 1226; *VirnetX, Inc.*, 767 F.3d at 1326.

[70] *LaserDynamics, Inc.*, 694 F.3d at 67-68 ("It is not enough to merely show that the disc discrimination method is viewed as valuable, important, or even essential to the use of the laptop computer. Nor is it enough to show that a laptop computer without an ODD practicing the disc discrimination method would be commercially unviable. Were this sufficient, a plethora of features of a laptop computer could be deemed to drive demand for the entire product."). Earlier, in *Marine Polymer Techs. v. Hemcon, Inc.*, 672 F.2d 1350, 1360 (Fed. Cir. 2012), the Federal Circuit declined to disturb a damages award under the EMVR where there was "evidence pertaining to the importance" of the patented feature, as well as its "significance for market demand." But even if not followed by *LaserDynamics*, as an equally divided opinion, the affirmance in *Marine Polymer* is not entitled to precedential weight. *See Neil v. Biggers*, 409 U.S. 188, 192 (1972).

[71] *VirnetX, Inc.*, 767 F.3d at 1326. In most cases, demand for the entire apparatus is not interchangeable with demand for a patented component of the larger apparatus. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011); *Lucent Techs., Inc.*, 580 F.3d at 1337–38.

[72] *See* Docket No. 293-11, Exh. 5 at ¶¶ 223-28.

demand.[73] That customers find these features important merely confirms that they are trying to purchase a specific kind of product. That the Gartner reports identify these characteristics as "critical"[74] only serves to classify the products as within a certain category. As was true in *LaserDynamics*, "[t]here is no evidence that th[ese] feature[s] alone motivate[] consumers to purchase" the accused MobileIron products.[75] In the absence of a sufficient apportionment, this lack of demand evidence renders Weinstein's first royalty scenario methodology unsound.[76]

*Second*, Weinstein's second royalty scenario improperly applies the Nash Bargaining Solution. In *VirnetX*, the Federal Circuit rejected Weinstein's NBS analysis, holding that a default assumption of a 50/50 split was an impermissible "rule of thumb."[77] The court explained that the NBS cannot be assumed to apply in every case and that the 50/50 split, even if later modified, impermissibly risked skewing the baseline assumptions of the jury.[78] The court ultimately held that NBS theories should be excluded except in the unlikely circumstance that a 50/50 split is

---

[73] Docket No. 293-6, Exh. 1 at 56:16-21.

[74] *See* Docket No. 293-11, Exh. 5 at ¶ 229 (explaining that absent the inclusion of certain "critical" patented features, companies would not be allowed to be in Gartner's Magic Quadrant report).

[75] *LaserDynamics, Inc.*, 694 F.3d at 69.

[76] In a final stab at saving Weinstein's first royalty scenario, Good argues that Weinstein may nevertheless "apply the EMVR where the products in question perform as 'a single functioning unit.'" Docket No. 316-5 at 6 (citing *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1371 (Fed. Cir. 2004); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995) (en banc)). But neither Weinstein nor Smith offer any such opinion—in fact, Weinstein concedes that the components of Advanced Management are sold together for a business convenience. *See* Docket No. 293-6, Exh. 1 at 98:21-99:4; Docket No. 197 at 5:11-16. Even if they did, Weinstein is still required to show that the patented features drive demand. *See Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp.2d 279, 286-87 (N.D.N.Y. 2009) (Rader, J.).

[77] *VirnetX, Inc.*, 767 F.3d at 1332.

[78] *Id.* at 1332-33 ("Anyone seeking to invoke the [NBS] theorem as applicable to a particular situation must establish that fit, because the 50/50 profit-split result is proven by the theorem only on those premises. Weinstein did not do so. This was an essential failing in invoking [NBS]. Moreover, we do not believe that the reliability of this methodology is saved by Weinstein's attempts to account for the unique facts of the case in deviating from the 50/50 starting point. . . . Indeed, Weinstein's thin attempts to explain his 10% deviation from the 50/50 baseline in this case demonstrates how this methodology is subject to abuse. His only testimony on the matter was that although he 'considered other splits,' he ultimately determined that a 10% deviation—resulting in a 45/55 split—was appropriate 'to reflect the fact that Apple would have additional bargaining power over VirnetX back in . . . 2009. Such conclusory assertions cannot form the basis of a jury's verdict." (internal citations omitted)).

shown to fit the particular facts of a case.[79] In *VirnetX* and *Suffolk Tech*, the Federal Circuit and the district court, respectively, took issue with Weinstein's failure to explain why the parties would have agreed to a 50/50 split in the first instance.[80] Here, once again, Weinstein similarly fails to tie the 50/50 split to the specifics of this case or to explain why such a split would be reasonable—other than to invoke a boilerplate assertion about the relative bargaining powers of the parties.[81] What he does is nothing more than to start with an assumed 50/50 split—exactly what the Federal Circuit found erroneous in his *VirnetX* analysis.

Separate and apart from the NBS analysis, the second scenario reflects an insufficiently sound methodology to get to the jury. While Weinstein avoids the fatal mistake of his first royalty scenario by further apportioning Advanced Management by considering what the Gartner documents list as "inclusion criteria"[82] in arriving at a 30/70 split of incremental profit,[83] he relies on no analysis of what weight to assign to what feature. He conducts no survey and consults no technical experts.[84] In fact, at his deposition he could not explain how he made the determination or whether any of the inclusion criteria were implicated by a specific patent.[85]

---

[79] *Id. See also Suffolk Techs. LLC v. AOL Inc.*, Case No. 12-cv-00625, 2013 U.S. Dist. LEXIS 64630, at *1-2 (E.D. Va. Apr. 12, 2013).

[80] *VirnetX, Inc.*, 767 F.3d at 1332-33; *Suffolk Techs. LLC*, 2013 U.S. Dist. LEXIS 64630, at *1 ("Weinstein does not explain why *these* parties would have accepted a 50/50 split. Thus, the '50/50 split' is plainly not tied to the facts of this case and is essentially no different from the 25% rule of thumb rejected in *Uniloc*." (emphasis in original)).

[81] *See* Docket No. 293-11, Exh. 5 at ¶ 259 (assuming that MobileIron would agree to a split of incremental profits to account for "the relative importance of the accused functionality and for various MDM/EMM functionality supplied by MobileIron" but failing to explain why MobileIron would be interested in a 50/50 split in the first instance).

[82] *Id.* at ¶¶ 215-17, 263.

[83] *Id.* at ¶ 264.

[84] *See* Docket No. 293-6, Exh. 1 at 137:9-16 (Q. Did you ever sit down with Mr. Herrema or Dr. Smith and have the Gartner inclusion criteria and their patents and say which of these patents have to do with which of these criteria? A. No., we did not do that.").

[85] *Id.* at 134:12-137:8.

---

This is no different than the methodology rejected by Judge Dyk in *Stragent, LLC v. Intel Corp*.[86] There, the damages expert determined that the patent-in-suit related to one of 19 product features on a list, arbitrarily assigned an equal value to each product feature and used the resulting percentage to apportion the price of the infringer's product. Judge Dyk held that this methodology lacked "the requisite indicia of expert reliability."[87] Here, Weinstein similarly counts up the ten Gartner inclusion criteria, assigns equal value to each one, and uses the resulting 30 percent to apportion MobileIron's profits. Weinstein does no investigation into whether any of the criteria is more important than others, or how strongly each criterion is tied to the patents. This is insufficient.[88]

***Third***, Weinstein's third royalty method avoids the fatal errors of the first two by apportioning the average sales price of Advanced Management to estimate a reasonable royalty for the app store contained within, which allegedly infringes the '322 patent alone. Weinstein first considers the price differential between an old version of Advanced Management that did not include the app store or Sentry and the most recent version of Advanced Management that includes both of those features and sells for a higher price.[89] Then, based on witness testimony that the app store was more important than Sentry,[90] such that it could not account for less than half the value, Weinstein applied half of the price differential between the two versions of Advanced Management to the app store feature, thereby determining 18.75 percent is attributable to the app store.[91] While MobileIron argues that Weinstein fails to appropriately apportion—mirroring his flawed first

---

[86] Case No. 11-cv-00421, 2014 U.S. Dist. LEXIS 106167, at *14-18 (E.D. Tex. Mar. 6, 2014).

[87] *Id*. at *15.

[88] Weinstein also provided an alternative analysis in which Good would negotiate for all incremental profits to be included in the royalty. *See* Docket No. 293-11, Exh. 5 at ¶ 255. MobileIron does not appear to challenge this particular theory.

[89] *See id.* at 94, n. 365.

[90] *See* Docket No. 316-11, Exh. 4 at 43:8-16.

[91] *See* Docket No. 293-11, Exh. 5 at 94, n.365.

14
Case Nos. 5:12-cv-05826-PSG
ORDER GRANTING-IN-PART MOTION TO EXCLUDE TESTIMONY

method—here Weinstein does consider only the feature of the product alleged to infringe the disputed patent. His analysis on this discreet issue passes muster.[92]

***Fourth***, Weinstein's fourth royalty scenario as to the '322 patent must be excluded to the extent it relies on the NBS to reach a 50/50 split. Good argues that Weinstein determined that Good would have a better bargaining position based on its two operable, non-infringing alternatives in BoxTone and Good for Enterprise.[93] He opined that Good would have been able to argue for a split that would give less than 33 percent of the profits to MobileIron, but he adjusted upward to a 50/50 split to be conservative.[94] As discussed above, such a split is improper absent a showing that the assumptions underlying the NBS are present here, which Weinstein has not done.[95]

***Fifth***, Hugh Smith's expert opinions about the commercial acceptability of non-infringing alternatives is excluded as improper expert testimony. Under Fed. R. Evid. 702, expert testimony must be based on "the expert's scientific, technical or other specialized knowledge."[96] Smith's proffered testimony on customer expectations and preferences in the enterprise mobility management market is not based in any market research or particular expertise in the area.[97] Good counters that Smith's technical expertise in the industry qualifies him to opine on non-infringing alternatives.[98] Smith has worked in the software industry for over 30 years and has taught classes

---

[92] Weinstein's royalty opinion regarding damages for Good's alleged infringement of MobileIron's '016 patent also is excluded to the extent it improperly relies on the NBS. As with his second royalty scenario for damages for MobileIron's alleged infringement of Good's patents, Weinstein fails to justify relying on a rule of thumb of a 50/50 split of profits from Good's sales.

[93] *See* Docket No. 293-34, Exh. 21 at ¶¶ 152-54.

[94] *See id.*

[95] *See VirnetX, Inc.*, 767 F.3d at 1332. Weinstein's NBS opinion as to the '322 patent is out, but Weinstein's alternate theory that rests on an award of the entire incremental profit does not suffer the same defect and can be presented at trial. *See* Docket No. 294, Exh. 21 at ¶ 193.

[96] Fed. R. Evid. 702.

[97] *See* Docket No. 293-36, Exh. 23 at 406:4-408:4.

[98] *See* Docket No. 294, Exh. 22 at ¶¶ 52, 57, 64.

on computer security.[99] While Smith is more than qualified technically, experience with the technology does not give an individual expertise in consumer demand related to those non-infringing alternatives.[100] It would be improper to present such testimony to the jury cloaked in the guise of expert opinion.[101]

## IV.

The motion is GRANTED-IN-PART.

**SO ORDERED.**

Dated: July 5, 2015

PAUL S. GREWAL
United States Magistrate Judge

---

[99] *See* Docket No. 315-10, Exh. 8.

[100] *Cf. Brandeis Univ. v. Keebler Co.*, Case No 12-cv-01508, 2013 U.S. Dist. LEXIS 1898, 27-28 (N.D. Ill. Jan. 18, 2013) (Posner, J.) (excluding damages expert testimony when expert had no expertise in consumer demand of product at issue).

[101] MobileIron also raises objections to Weinstein's lost profits theories and to Smith's expert testimony about willfulness and indirect infringement. Because the court has granted summary judgment on willfulness, indirect infringement and lost profits, the motion as to these discreet issues is DENIED AS MOOT.