UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GOOD TECHNOLOGY CORPORATION and GOOD TECHNOLOGY SOFTWARE, INC., <br><br>                  Plaintiffs,<br>v.<br><br>MOBILEIRON, INC.,<br><br>                  Defendant. | Case No. 5:12-cv-05826-PSG<br><br>**ORDER GRANTING-IN-PART MOTION TO EXCLUDE TESTIMONY**<br><br>**(Re: Docket No. 296)** |

Another batch of experts, another batch of expert challenges. This time, Plaintiffs Good Technology Corporation and Good Technology Software, Inc. move to exclude the opinions and testimony of Defendant MobileIron, Inc.'s experts—Richard Eichmann, Earl Sacerdoti, Stephen Gray and Peter Reiher. The court agrees that certain of these expert opinions may not ultimately prove persuasive. But most are the product of reliable principles and methods. The motion is GRANTED-IN-PART.

**I.**

By now, even a casual observer of this case knows its background. Good develops and sells mobile data and device management technologies.[1] Good owns United States Patent Nos. 6,151,606, 7,702,322, 7,970,386 and 8,012,219.[2] The '606 patent teaches disabling access to data

---

[1] *See* Docket No. 32 at ¶ 2.

[2] *See id.* at ¶¶ 18-21.

on a mobile device after the user has finished using the data.[3] The '219 patent teaches a server system that can be used to prevent access to data stored on a mobile device through encryption or deletion.[4] The '386 patent teaches a rules engine on a wireless device that can receive a set of rules from a server and execute the set of rules so as to monitor and take action on the wireless device based on policies.[5] The '322 patent teaches distribution of software updates for wireless devices that are governed by customer-defined software policies and communicated over the internet.[6] Good's products include Good for Enterprise, Good for Government, Good Dynamics, BoxTone and AppCentral.[7]

MobileIron is an enterprise mobility management solutions provider, which enables companies to secure, control and manage mobile devices, mobile apps and mobile content. MobileIron owns United States Patent No. 8,359,016, which teaches filtering a catalog of mobile device applications based on a set of policies applied to a user profile and a mobile device profile to select a set of applications to return to the user.[8]

In late 2012, Good sued MobileIron alleging both infringement of the '606, '322, '386 and '219 patents and violations of the Lanham Act and California Business and Professions Code Section 17200. MobileIron counterclaimed, alleging that Good's AppCentral product infringes MobileIron's '016 patent.

Eichmann estimates the damages caused by Good's alleged infringement of the '016 patent.[9] Part of Eichmann's opinion involves calculating a reasonable royalty MobileIron would

---

[3] *See* Docket Nos. 32-1, 32-2. The court previously ruled that the '606 patent is neither valid nor infringed by the accused MobileIron products. *See* Docket No. 424.

[4] *See* Docket No. 32-5.

[5] *See* Docket No. 32-4.

[6] *See* Docket No. 32-3.

[7] AppCentral is a product that allows companies to distribute mobile applications to their users. *See* Docket No. 191-10.

[8] *See* Docket No. 41 at 10.

[9] *See* Docket No. 317-6, Exh. 1 at ¶ 2.

have received for licensing the '016 patent to Good.[10]  Eichmann weighs the *Georgia-Pacific* factors to determine what the parties would have agreed to in a hypothetical negotiation for a license.[11]  After determining Good's standalone AppCentral product has a close relation to the '016 patent's claimed functionality, Eichmann calculates the royalty base by adding the number of AppCentral licenses to the number of licenses sold for Good Dynamics, a product that includes AppCentral's functionality.[12]  Based on MobileIron's internal discussions over AppCentral pricing, he further opines Good would have entered into a hypothetical negotiation anticipating it could sell AppCentral as a standalone product for a certain number of dollars per month.[13]  He then estimates the parties would have agreed to a reasonable royalty rate of a lesser number of dollars per unit per month—the expected incremental operating profit of each unit.[14]

Gray and Sacerdoti opine that a number of systems anticipate certain claims of Good's patents-in-suit.  Specifically, Gray concludes the software product "PDA Defense" is a prior art system that anticipates the '219 patent.[15]  Sacerdoti concludes the software products AMO 3.1 and Altiris 6.1 are prior art systems that anticipate the '386 patent.[16]  Sacerdoti also concludes that Microsoft SMS 2003—combined with the Device Management Feature Pack—anticipates the '386 and '322 patents.[17]  Both experts use similar methodologies to support their opinions.  For each

---

[10] *See id.* at ¶ 85.

[11] *See id.* at ¶ 10.  The *Georgia-Pacific* factors constitute a non-exhaustive list of fifteen factors to consider in determining what reasonable royalty would result from a hypothetical negotiation.  *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y 1970).

[12] *See* Docket No. 317-6, Exh. 1 at ¶¶ 71, 73, 88.

[13] *See id.* at ¶¶ 74-76.

[14] *See id.* at ¶ 76.  Eichmann also prepared a rebuttal report to challenge Good's lost profits claims for MobileIron's alleged infringement of the '606, '322, '386 and '219 patents.

[15] *See* Docket No. 317-10, Exh. 28 at ¶¶ 106-07.

[16] *See* Docket No. 297-9, Exh. E at 60-63, 69-72.

[17] *See id.* at 48-53, 105-110.

system, Gray and Sacerdoti examine a number of documents that describe features of the software and other versions of the software.[18]

Reiher opines that the "Lange" reference (United States Patent Application No. 2012/0072312) is not prior art to the '016 patent because it was filed with the United States Patent Office approximately two months before MobileIron's '016 patent.[19] Reiher also opines that a MobileIron product—MobileIron version 2.0—practiced the '016 patent before Lange's filing date.[20]

## II.

This court has subject matter jurisdiction pursuant to 15 U.S.C. § 1125 and 28 U.S.C. §1367. The parties further consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. §636(c) and Fed. R. Civ. P. 72(a).

Expert testimony may only be admitted in a manner consistent with the Federal Rules of Evidence, *Daubert*,[21] *Kumho*[22] and more recent appellate court progeny.[23] Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will help "the trier of fact to understand the evidence or to determine a fact in issue."[24] When considering expert testimony, the trial court serves "as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards."[25]

---

[18] *See* Docket No. 317-10, Exh. 28 at ¶ 106, Docket No. 317-11, Exh. 33 at C-1, D-1, E-1. To assess Altiris 6.1's functionality, Sacerdoti also relies on a MobileIron consultant's claimed re-creation of the system. *See* Docket No. 297-9, Exh. E at 5.

[19] *See* Docket No. 317-5 at 24.

[20] *See* Docket No. 318-5, Exh. 43 at 175-76.

[21] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[22] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

[23] *See, e.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014).

[24] *See Daubert*, 509 U.S. at 589.

[25] *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). A district court's decision to admit expert testimony under *Daubert* in a patent case must follow the law of the regional circuit. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003) ("Whether proffered

An expert witness may provide opinion testimony if: (1) "the testimony is based upon sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods; and" (3) "the expert has reliably applied the principles and methods to the facts of the case."[26] "Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony."[27] The inquiry into the admissibility of an expert opinion is a "flexible one" where shaky "but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."[28]

A trial court must be sure that its review of expert testimony focuses "solely on principles and methodology, not on the conclusions that they generate."[29] "A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another. These tasks are solely reserved for the fact finder."[30] The Federal Circuit recently clarified that this limitation of the gatekeeping role of the judge to the exclusion of "testimony based on unreliable principles and methods is particularly essential in the context of patent

---

evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit, here the Fifth Circuit.").

[26] Fed. R. Evid. 702; *see also Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008) ("Patent cases, like all other cases, are governed by Rule 702. There is, of course, no basis for carving out a special rule as to experts in patent cases.").

[27] *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (citing *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

[28] *Id.* at 564 (citing *Daubert*, 509 U.S. at 592-96).

[29] *Daubert*, 509 U.S. at 592-94, 596.

[30] *Apple Inc. v. Motorola, Inc.*, 757 F.3d at 1314.

5
Case Nos. 5:12-cv-05826-PSG
ORDER GRANTING-IN-PART MOTION TO EXCLUDE TESTIMONY

damages."[31]  This is because "questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'"[32]

### III.

Beginning with Eichmann, Good challenges several aspects of his opinion, including that he fails to show sufficient evidence of the claimed functionality driving demand for AppCentral, that he fails to apportion to the smallest salable patent practicing unit, that he fails to use the actual sale price of the accused product and that he inappropriately allocates all profits on the accused product to MobileIron.  But as to each of these challenges, MobileIron has the better of the argument.

To determine the SSPPU, "a patentee must take care to seek only those damages attributable to the infringing features."[33]  The "law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else that its patented technology drove demand for the entire product."[34]  Good posits that Eichmann fails to provide any analysis of the economic contribution of technology not claimed in the patent.[35]  But Good fails to offer any evidence or counter-opinion that AppCentral can be further apportioned.  In fact, as MobileIron points out, Eichmann apportions down from product bundles—such as Good Dynamics—that include AppCentral and myriad other products to the stand-alone AppCentral.  Unlike in Weinstein's analysis—where MobileIron presented evidence that Advanced Management includes

---

[31] *Id.* at 1315.

[32] *Id.* ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.") (citing *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010)).

[33] *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014).

[34] *Id.* at 1329; *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012); *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("The essential requirement is that the ultimate reasonably royalty award must be based on the incremental value that the patented invention adds to the end product."); *Open Text S.A. v. Box, Inc.*, Case No. 13-cv-04910, 2015 U.S. Dist. LEXIS 8783, at *24-25 (N.D. Cal. Jan. 23, 2015).

[35] *See* Docket No. 297-4 at 5-6; Docket No. 333-4 at 2-3.

at least three separate features, one of which clearly does not fall within the patented features—here, Good merely points fingers without providing any additional support.[36] Without any evidence that there is anything beyond AppCentral to apportion down to, Eichmann's apportionment is methodologically sound.[37]

Good also takes issue with Eichmann's reliance on a hypothetical sales price of AppCentral rather than on its actual sales price. Good argues that because actual sales data was available to Eichmann, it was improper for him to compute a hypothetical sales price upon which to base his reasonable royalty calculation.[38] But Good cites no authority prohibiting such methodology. In fact, the Federal Circuit has approved the use of a hypothetical profit when determining reasonable royalties in relation to a hypothetical negotiation. In *Aqua Shield v. Interpool Cover Team*, the Federal Circuit explained that although an infringer's actual profits may be relevant "in an indirect and limited way," the "core economic question is what the infringer, in a hypothetical pre-infringement negotiation under hypothetical conditions, would have anticipated the profit-making potential of use of the patented technology to be, compared to using non-infringing alternatives."[39] And that is exactly what Eichmann does. He considers internal Good documents that suggest a

---

[36] *See* Docket No. 436 at 9-10.

[37] Because Eichmann's apportionment passes muster, the court does not reach Good's argument that MobileIron provides sufficient evidence that the claimed functionality drove demand for AppCentral as a whole. *See Garretson v. Clark*, 111 U.S. 120, 121 (1884) (holding that a patentee must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature).

[38] *See* Docket No. 297-4 at 8.

[39] 774 F.3d 766, 772 (Fed. Cir. 2014); *see also Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013) ("[t]he infringer's selling price can be raised if necessary to accommodate a higher royalty rate, and indeed, requiring the infringer to do so may be the only way to adequately compensate the patentee for use of its technology."); *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384-85 (Fed. Cir. 2001); *i4i Ltd. P'ship*, 598 F.3d at 853-55 (finding that expert's reliance on defendant's internal documents reflecting the retail price for the patented technology prior to infringement had a "sufficient nexus to the relevant market, the parties, and the alleged infringement.").

range of potential prices around the time of the hypothetical negotiation.[40] From those potential prices, he chooses the figure that seems most likely and applies that figure as the royalty rate. Based on testimony from Good employees about the likely gross profit margin, he applies a more conservative margin. Good can point to no case law that suggests that Eichmann's assumptions are improper or that his opinion should be precluded on this basis.

As to whether Eichmann puts forth adequate support to sustain an allocation of 100 percent of incremental profits to MobileIron, while the court is skeptical of Eichmann's conclusion, this is not a problem of methodology. Rather, it is a question of fact properly left for the jury. On the one hand, Good argues that there is no evidence that Good would ever have agreed to an arrangement that would have left it with no profits whatsoever.[41] But MobileIron counters that Eichmann allocates 100 percent of Good's incremental operating profit to MobileIron because the AppCentral standalone product is the SSPPU, which is closely related to the claimed functionality of the '016 patent.[42] Whatever its ultimate merit, as gatekeeper, the court cannot say that Eichmann's allocation methodology is unsound.[43]

Turning to Gray, he appropriately relies on information he received from MobileIron employee Suresh Batchu to opine on non-infringing substitutes related to the '219 patent.[44] In order to rely on a non-infringing alternative, the alternative must be shown to be "acceptable" to customers; "[m]ere existence of a competing device does not make that device an acceptable substitute."[45] Gray opines that "Multiple-Command Transmission" is a hypothetical alternative to

---

[40] *See* Docket No. 317-6, Exh. 1 at 31-32 nn.122-29, 131-32 (citing Docket No. 317-7, at Exhs. 7-8, Docket No. 317-8 at Exhs. 9-10).

[41] *See* Docket No. 297-4 at 9-10.

[42] *See* Docket No. 317-5 at 11.

[43] Good also objects to Eichmann's opinions regarding Good's lost profits from MobileIron's alleged infringement of Good's patents. Because the court has granted summary judgment in favor of MobileIron on the issue of Good's lost profits, *see* Docket No. 378, Good's motion as to this discreet issue is DENIED AS MOOT.

[44] Good also seeks to exclude Gray's opinion about non-infringing substitutes of the '606 patent. Because the court has granted summary judgment of non-infringement and invalidity of the '606 patent, *see* Docket No. 424, Good's motion as to this discreet issue also is DENIED AS MOOT.

[45] *TWM Mft. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986).

8
Case Nos. 5:12-cv-05826-PSG
ORDER GRANTING-IN-PART MOTION TO EXCLUDE TESTIMONY

the '219 patent.[46] To reach this conclusion, Gray consulted Batchu, who confirmed that the alternative is both technically acceptable and feasible.[47] Good argues that Gray inappropriately bases his non-infringing alternatives opinion solely on Batchu—who as a lay witness and a party witness—is not in a position to give expert testimony.[48] But MobileIron offers evidence that Gray conducts extensive independent analysis based on his own experience in the industry.[49] He then confirms that his conclusions also apply as to MobileIron, specifically, by consulting with Batchu about the feasibility and acceptability of his non-infringing alternatives.[50] Furthermore, Batchu is not any lay MobileIron employee. As Chief Technology Officer and Senior Vice President of Technology and Engineering, Batchu is in a position to know exactly what types of substitutes are feasible and acceptable.[51] His position requires him to understand customer needs, evaluate the technologies that MobileIron should pursue and then oversee the product development.[52] To the extent that Batchu's credibility is in question, Good can remedy this concern on cross-examination.[53] On this record, the court finds no basis on which to exclude Gray's opinion on non-infringing alternatives.[54]

---

[46] *See* Docket No. 255-40 at ¶¶ 334-37.

[47] *See id.* at ¶ 337.

[48] *See* Docket No. 297-4 at 13-14.

[49] *See* Docket No. 318-3, Exh. 29 at 131:10-13; 143:23-144:2.

[50] *See Open Text S.A.*, 2015 WL 393858, at *7 (approving damages expert's reliance on lay opinion of "Architect and Co-Owner" to "confirm that a particular non-infringing alternative would be technically feasible and to estimate how long it would take" to implement).

[51] *See* Docket No. 318-3, Exh. 27 at 21:19-21; 38:12-13.

[52] *See id.* at 41:18-42:5 (describing responsibilities as including "look[ing] into new technologies that MobileIron should pursue, do[ing] the prototypes of new technologies" and "the engineering execution to build the products"); 45:21-46:5 (explaining how customer needs are anticipated); 195:4-18 (describing presentations to potential customers).

[53] *See Oracle Am., Inc. v. Google Inc.*, Case No. 10-cv-03561, 2011 WL 5914033, at *2 (N.D. Cal. Nov. 28, 2011) (holding that an expert's reliance on interviews with a party's engineers are proper as long as engineers testify to the foundational facts at trial).

[54] Good also seeks to exclude Eichmann's lost profits opinion based on its reliance on Gray's expert opinion. Because the court has granted summary judgment of lost profits, *see* Docket No. 378, the motion as to this discreet issue is DENIED AS MOOT.

Good's concerns about Gray's and Sacerdoti's opinions on prior art systems raise questions of fact rather than methodology, rendering their exclusion inappropriate at this juncture. In general terms, Good argues that Gray and Sacerdoti assemble groups of documents and assert that they are physical systems that anticipate or render obvious certain of the patents in suit. Good relies on *Kyocera Wireless Corp. v. ITC* for the proposition that a collection of documents cannot be commingled to function as a single, coherent reference."[55] On this basis, Good argues that Sacerdoti's invalidity opinions on the Altiris System, the SMS System and the AMO System, and Gray's invalidity opinions on the PDA Defense System—because they all rely on groups of documents rather than single, coherent references—should be precluded as unreliable and unfounded.

MobileIron counters that *Kyocera Wireless* is limited to "printed publication" prior art. That multiple printed publications cannot be combined is uncontroverted.[56] But that is not what MobileIron's experts offer. Rather, Gray and Sacerdoti offer the collection of documents not as "printed publications" but rather as systems that were previously used,[57] which can be established with multiple pieces of evidence.[58] And as to each system, the court agrees that *Kyocera* does not apply.

As to Gray's opinions regarding the PDA Defense system, Gray concludes that PDA Defense is a prior art system to the '219 patent that was known and used before the relevant date.[59]

---

[55] 545 F.3d 1340, 1351-52 (Fed. Cir. 2008).

[56] *See id.* at 1350-51.

[57] *See* Docket No. 317-10, Exh. 28 at Exh. D at 1; Docket No. 317-11, Exh. 33 at C-1, D-1, E-1 (explaining that systems were "commercially available and in public use" prior to the relevant date).

[58] *See Sonoscan, Inc. v. Sonotek, Inc.*, 936 F.2d 1261, 1263 (Fed. Cir. 1991) (citing *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1060 (Fed. Cir. 1989); *Zenith Elecs. Corp. v. PDI Commun. Sys.*, 522 F.3d 1348, 1358-59 (Fed. Cir. 2008) (finding that public use of joint TV and speaker system anticipated based on "schematics and testing" by expert); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1352-54 (Fed. Cir. 2004) (relying on multiple pieces of evidence to prove existence of prior use); *see also Finjan, Inc. v. Symantec Corp.*, Case No. 10-cv-00593, 2013 U.S. Dist. LEXIS 134030 (D. Del. Sept. 19, 2013) (explaining that source code and product documentation relating to the same product are treated as evidence of one prior art reference).

[59] *See* Docket No. 317-10, Exh. 28 at ¶ 107.

He bases this conclusion on technical documents and deposition testimony from David Melnick, the former President of PDA Defense.[60]  Good argues that the PDA Defense system cannot possibly be a single prior art system because Gray's supporting documents discuss using the product to simultaneously manage mobile devices operating on different platforms.[61]  But simply because a system can be employed in various ways and on various platforms or devices does not mean that all of those devices and platforms are being combined.[62]  Rather, these documents are illustrative of the system itself and how it functions.  Again, this is a fact question for the jury, not a *Daubert* issue for the court.[63]

As to Sacerdoti's opinions regarding the Altiris system, Sacerdoti concludes that Altiris is prior art that anticipates or renders obvious certain claims of the '386 patent.  He bases this conclusion on technical documents describing version 6.1 of various components of the Altiris system that collectively form a single unitary system.[64]  The crux of Good's argument, is that Sacerdoti fails to show that the system ever existed, and even if it did, he bases his conclusion on a collection of documents that cannot properly constitute a prior art system.[65]  But the underlying system is itself comprised of multiple components: Altiris Security Solution, Altiris Inventory Solution and Altiris Notification Server.[66]  Because the very system itself is multi-component in nature, it is not a methodological error to rely on these underlying documents.  Rather, whether the components, taken as a whole, constitute a system that anticipates or renders obvious some of the '386 patent claims, is a question for the jury.

---

[60] *See id.*

[61] *See* Docket No. 297-4 at 20, 21.

[62] For example, Gray also relies on the PDA Defense "Administrator Guide," which explains that the product utilizes a single administrator console to monitor multiple devices across different platforms.  *See* Docket No. 317-12, Exh. 34.

[63] *See Open Text S.A.*, 2015 WL 393858, at *7 (explaining that question of whether documents describe the same version of a software product "is a fact issue for the jury to decide").

[64] *Cf. Zenith Elecs. Corp.*, 522 F.3d at 1358 (analyzing TV and speaker that were designed to work together as one anticipating system).

[65] *See* Docket No. 297-4 at 16-17.

[66] *See* Docket No. 317-11, Exh. 33 at 69.

As to Sacerdoti's opinions regarding the Systems Management Server system, Sacerdoti concludes that SMS is prior art that anticipates or renders obvious certain claims of the '386 and '322 patents.[67] He bases this conclusion on various technical documents and marketing materials that describe Microsoft SMS 2003 and its add-on Device Management Feature Pack.[68] Good argues that the documents contain different copyright and publication dates—that vary by one year—making it impossible for them to describe a single system.[69] But again, this is not a question of methodology by rather a question of fact to be resolved by the jury.

As to Sacerdoti's opinions regarding the Asset Management Option system, Sacerdoti concludes that AMO is prior art that anticipates or renders obvious certain claims of the '386 patent.[70] He bases this conclusion on a combination of technical documents, marketing materials and custom computer code scripts that show the functionality of version 3.1 of AMO.[71] Good argues that Sacerdoti includes documents from 1998 to 2005 which reference difference versions of AMO, suggesting that the system changed over time and cannot have been the same prior art system.[72] MobileIron admits that Sacerdoti uses documents relating to both versions 3.0 and 3.1 but clarifies that the documents are reliable because they generally describe the same features and components across both versions.[73] In any event, whether documents describe the same version of a software product is "a fact issue for the jury to decide."[74]

Finally, Reiher's opinion that the Lange reference is not prior art to the '016 patent because the '016 patent was reduced to practice in a MobileIron product before the Lange reference was

---

[67] *See id.* at 48-53.

[68] *See id.* at C-1, 48-50.

[69] *See* Docket No. 296-19 at Exh. Q; Docket No. 296-20 at Exh. R.

[70] *See* Docket No. 297-9, Exh. E at D-11, D-12.

[71] *See* Docket No. 186-7, Appendix D at 1.

[72] *See* Docket No. 297-4 at 22-23.

[73] *See* Docket No. 317-11, Exh. 33 at 69.

[74] *See Open Text S.A.*, 2015 WL 393858, at *7.

published is methodologically sound. "[T]here cannot be a reduction to practice of the invention . . . without a physical embodiment which includes all limitations of the claim."[75]  Good argues that Reiher fails to tie each limitation of the claim to MobileIron version 2.0, making the opinion unfounded and unreliable.[76]  MobileIron counters that Reiher does not address each claim limitation verbatim, but he addresses each of the independent claim limitations in one form or another.[77]  The claim limitations at issue are: (1) accessing a user profile and a mobile device profile in response to a request for applications, (2) filtering a catalog of applications based on policies applied to the profiles and (3) returning the applications to an enterprise application store interface that allows users to select applications for installation.[78]  Reiher addresses each concept in turn by opining on (1) labels that are based on user device characteristics,[79] (2) filtering a catalog of applications based on those labels[80] and (3) an application store interface that enabled users to select applications for installation from a filtered list.[81]  Ultimately, while Reiher's report perhaps is not as precise as it could have been, he does appear to opine on at least the independent claim

---

[75] *UMC Elecs. Co. v. United States*, 816 F.2d 647, 652 (Fed. Cir. 1987); *see Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 997 (Fed. Cir. 2007) ("An invention is reduced to practice when the patentee has an embodiment that meets every limitation and operates for its intended purpose.").

[76] *See* Docket No. 297-4 at 23-24; *see* Docket No. 261-6 at ¶ 132; Docket No. 297-19, Exh. W at ¶ 48-51.  Good also argues that Reiher admitted in his deposition that he failed to address several claim limitations, including limitations regarding mobile device profiles, filtering, application management interfaces, user directory stores, application identification and user profits.  *See* Docket No. 297-18, Exh. V at 175:1-3, 175:22-176:5, 176:6-17, 176:18-22, 176:23-177:2, 177:3-7. MobileIron points out that during the same deposition, Reiher later discusses his analysis of the very claim limitations at issue.  *See* Docket No. 318-5, Exh. 43 at 175:4-11 (user profiles and device profiles), 189:15-190:17 (mobile device application management interface), 190:18-191:8 (filtering), 191:9-25 (selecting for installation).

[77] MobileIron admits that Reiher does not address certain dependent claim limitations.  *See* Docket No. 317-5 at 24 n.127.  On this limited basis, his testimony must be precluded.  But that alone does not preclude his testimony in full.

[78] *See* Docket No. 318-4, Exh. 41 at 21:55-22:3, 22:25-46, 23:2-22; Docket No. 135.

[79] *See* Docket No. 318-5, Exh. 44 at ¶¶ 49-50.

[80] *See id.* at ¶ 50.

[81] *See id.* at ¶ 49.

---

13
Case Nos. 5:12-cv-05826-PSG
ORDER GRANTING-IN-PART MOTION TO EXCLUDE TESTIMONY

limitations.  As to independent claims 1, 8 and 15 of the '016 patent, Reiher's opinion passes muster.

### IV.

The motion is GRANTED-IN-PART.

**SO ORDERED.**

Dated: July 10, 2015

_____
PAUL S. GREWAL
United States Magistrate Judge