**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GOOD TECHNOLOGY CORPORATION AND GOOD TECHNOLOGY SOFTWARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MOBILEIRON, INC., <br><br> Defendant. | Case No. 5:12-cv-05826-PSG <br><br> **AMENDED FINAL JURY INSTRUCTIONS** |

# 1. BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE

When a party has the burden of proof on any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

1

## 2. BURDEN OF PROOF—CLEAR AND CONVINCING EVIDENCE

2

When a party has the burden of proof on any claim or affirmative defense by clear and convincing
evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is
highly probable. This is a higher standard of proof than proof by a preponderance of the evidence.

You should base your decision on all of the evidence, regardless of which party presented it.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

1

### 3. EXPERT OPINION

2

Some witnesses, because of education or experience, were permitted to state opinions and the reasons for those opinions.

3

4

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reason given for the opinion, and all the other evidence in the case.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

United States District Court
For the Northern District of California

# 4. DEPOSITION IN LIEU OF LIVE TESTIMONY

As I have previously explained, a deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, or because the parties have agreed not to call an individual live, the deposition of that person may be used at the trial.

You should consider deposition testimony, presented to you in court by videotape or read to you from a deposition transcript in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

United States District Court
For the Northern District of California

**5. IMPEACHMENT EVIDENCE—WITNESS**

The evidence that a witness testified differently on a prior occasion may be considered, along with all other evidence, in deciding whether or not to believe the witness and how much weight to give to the testimony of the witness and for no other purpose.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

**6. DEMONSTRATIVE EVIDENCE**

During the trial, materials have been shown to you to help explain testimony or other evidence in the case. Other materials have also been shown to you during the trial, but they have not been admitted into evidence. You will not be able to review them during your deliberations because they are not themselves evidence or proof of any facts. You may, however, consider the testimony given in connection with those materials.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

1

## 7. CONFIDENTIALITY

2

During this trial, the attorneys have presented confidential information belonging to one of the parties as evidence. You are not to discuss or communicate any confidential evidence presented during this trial to anyone aside from the other jurors during deliberations, either during the trial or after the trial.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

**United States District Court**
For the Northern District of California

**8. FALSE ADVERTISING—ELEMENTS OF CLAIM**

Good Technology contends that MobileIron engaged in false advertising. To succeed on this claim, Good Technology must prove five things by a preponderance of the evidence:

1.  MobileIron made a false or misleading statement of fact in an advertisement or promotion about Good Technology's products.

    •   A statement is false if it is literally untrue.

    •   A statement is misleading if it can be shown that the statement has misled, confused or deceived the consuming public.

    •   MobileIron's representations constitute an advertisement or promotion if they are: (1) commercial speech; (2) by MobileIron and MobileIron is in commercial competition with Good Technology; (3) for the purpose of influencing consumers to buy MobileIron's goods or services; and (4) sufficiently disseminated to the relevant purchasing public to constitute "advertising" or "promotion" within the Mobile Device Management or Enterprise Mobile Management industry.

2.  The statement actually deceived or had the tendency to deceive a substantial segment of its audience.

3.  The deception was material, in that it was likely to influence the purchasing decisions of MobileIron's or Good Technology's consumers.

4.  MobileIron caused its statement to enter interstate commerce.  A statement enters interstate commerce if it is made across state lines.

5.  Good Technology is likely to be injured as the result of the false statement either by direct diversion of sales from itself to MobileIron, or by lessening of the goodwill which its products or business enjoy with its customers.

If you find that Good Technology has proved that MobileIron made a deliberately false or misleading statement of fact in an advertisement or promotion about Good Technology's products, then you may presume that points 2 and 3 above are met unless MobileIron has rebutted that presumption.  MobileIron will have rebutted such a presumption if it has shown there is evidence that the statement did not cause actual deception or that the statement was not likely to influence the purchasing decisions of MobileIron's or Good Technology's consumers.

If you find that Good has proved all five elements listed above, then you must find for Good Technology.  If you find that Good Technology has not proved all five elements listed above, then you must find for MobileIron.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

## 9. INTERPRETATION OF CLAIMS

Before you decide whether or not there has been infringement of any of Good Technology's or MobileIron's patent claims and whether or not the patent claims are valid, you will need to understand the patent claims. As I mentioned, the patent claims are numbered sentences at the end of each patent that describe the boundaries of the patent's protection. It is my job as judge to explain to you the meaning of any language in the claims that needs interpretation.

The parties have agreed on the meaning of some of the language in the claims at issue. The parties have agreed that:

    1.  In MobileIron's '016 patent, the term "mobile device profile" means "information that is specific to a particular mobile device."

    2.  In MobileIron's '016 patent, the term "user profile" means "information that provides characteristics of a particular user (such as name, email address, organizational information, etc.)."

    3.  In MobileIron's '016 patent, the accessing, filtering, and returning steps are performed in the recited order.

In addition, I have interpreted the meaning of some of the language in the patent claims involved in this case. You must accept those interpretations as correct. My interpretation of the language should not be taken as an indication that I have a view regarding the issues of infringement and invalidity. The decisions regarding infringement and invalidity are yours to make.

I have interpreted the following terms in the claims at issue as follows:

    4.  In MobileIron's '016 patent, the term "to provide the ability for the user to select, via the application management interface, one or more of the displayed applications for installation on the mobile device" means "to allow the user to select for installation one or more applications using the application management interface."

    5.  In MobileIron's '016 patent, the term "mobile device application management interface" means "a user interface that allows a user to manage the applications for a mobile device, which includes an interface to an enterprise application store."

    6.  In MobileIron's '016 patent, the term "identify[ing] required applications" means "identify[ing] which applications have been designated by an administrator as 'required' for a user or set of users."

    7.  In Good Technology's '322 patent, the term "searching a compatibility matrix [to identify/for] rules associated with each update" means "for each update, searching rules that indicate whether an update is compatible with a particular wireless device."

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

1   8.  In Good Technology's '322 patent, the term "rules uniquely identifying the updates for
2   the wireless device" means "rules used to identify updates available for a particular wireless
    device."

3   9.  In Good Technology's '322 patent, the term "message indicating one or more files
4   within the updates to [download/upload]" means "message indicating at least one file
5   within the updates to [download/upload]."

6   10.  In Good Technology's '386 patent, the term "rule" means "condition and an action to
7   be taken if that condition is met."

8   11.  In Good Technology's '386 patent, the term "rules engine" means "component on the
9   wireless device that, without further communication with a server, evaluates the
    condition(s) specified in one or more rules received from the server and takes any action
10  indicated by the rule."

11  12.  In Good Technology's '386 patent, the term "monitoring time interval" means "an
12  interval of time between instances of the rules engine gathering information on the device."

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

## 10. HOW A CLAIM DEFINES WHAT IT COVERS

I will now explain how a claim defines what it covers.

A claim sets forth, in words, a set of requirements. Each claim sets forth its requirements in a single sentence. If a device, system, or method satisfies each of these requirements, then it is covered by the claim.

There can be several claims in a patent. Each claim may be narrower or broader than another claim by setting forth more or fewer requirements. The coverage of a patent is assessed claim-by-claim. In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations." When a thing (such as a product or method) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim. In other words, a claim covers a product or method where each of the claim elements or limitations is present in that product or method.

As I just instructed you, there are certain specific terms that I have defined or that the parties have agreed upon and you are to apply the definitions that I provide to you. By understanding the meaning of the words in a claim and by understanding that the words in a claim set forth the requirements that a product or method must meet in order to be covered by that claim, you will be able to understand the scope of coverage for each claim. Once you understand what each claim covers, then you are prepared to decide the issues that you will be asked to decide, such as infringement and invalidity.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

United States District Court
For the Northern District of California

## 11. INFRINGEMENT—BURDEN OF PROOF

I will now instruct you on the rules you must follow in deciding whether infringement of one or more of the asserted claims of the patents in this case has been shown.  To prove infringement of any claim of any of the patents in this case, the patent holder must persuade you that it is more likely than not that the alleged infringer has infringed that claim.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

**12. DIRECT INFRINGEMENT**

A patent's claims define what is covered by the patent.  A product directly infringes a patent if it is covered by at least one claim of the patent.  A method directly infringes a patent if it is covered by at least one claim of the patent and is actually performed.

Deciding whether a claim has been directly infringed is a two-step process.  The first step is to decide the meaning of the patent claim.  I have already made this decision, and I have already instructed you as to the meaning of the asserted patent claims.  The second step is to decide whether the alleged infringer has made, used, sold, or offered for sale or imported within the United States a product or used within the United States a method covered by any claim of any of the patents in this case.  If it has, it infringes.  You, the jury, make this decision.

With one exception, you must consider each of the asserted claims of the patent individually, and decide whether the alleged infringer's product or method infringes that claim.  The one exception to considering claims individually concerns dependent claims.  A dependent claim includes all of the requirements of a particular independent claim, plus additional requirements of its own.  As a result, if you find that an independent claim is not infringed, you must also find that its dependent claims are not infringed.  On the other hand, if you find that an independent claim has been infringed, you must still separately decide whether the additional requirements of its dependent claims have also been infringed.

You may have heard evidence about both the patent holder's commercial product or method and the alleged infringer's accused product or method.  However, in deciding the issue of infringement you may not compare the alleged infringer's accused product or method to the patent holder's commercial product or method.  Rather, you must compare the alleged infringer's accused product or method to the claims of the asserted patent when making your decision regarding infringement.

Whether or not the alleged infringer knew its product or method infringed or even knew of the patent does not matter in determining direct infringement.

There are two ways in which a patent claim may be directly infringed.  A claim may be "literally" infringed, or it may be infringed under the "doctrine of equivalents."  The following instructions will provide more detail on these two types of direct infringement.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

# 13. LITERAL INFRINGEMENT

To decide whether the accused products or methods literally infringe any claims of the patents in this case, you must compare each product or method with the patent claim and determine whether every requirement of the claim is included in that product or method.  If so, the product or method literally infringes that claim.  You must decide literal infringement for each asserted claim separately.

If a patent claim uses the term "comprising," that patent claim is to be understood as an open claim. An open claim is infringed as long as every requirement in the claim is present in an accused product or method. The fact that an accused product also includes other parts or that an accused method includes additional steps will not avoid infringement, as long as the accused product or method has every requirement in the patent claim.

If the alleged infringer's product or method does not itself include every requirement in the patent claim, the alleged infringer cannot be liable for infringement merely because other parties supplied the missing elements, unless the accused infringer directed or controlled the acts by those parties. The alleged infringer does not direct or control someone else's action merely because the alleged infringer entered into a business relationship with that person.  Instead, the alleged infringer must specifically instruct or cause that other person to perform each step in an infringing manner, so that every step is attributable to the alleged infringer as controlling party.

If one party controls and makes use of a system that contains all the requirements of a claim, that party may be an infringer even though the parts of the system do not all operate in the same place or at the same time.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

**14. INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS**

If you decide that an accused MobileIron product or method does not literally infringe an asserted patent claim, you must then decide whether that product or method infringes the asserted claim under what is called the "doctrine of equivalents."

Under the doctrine of equivalents, the product or method can infringe an asserted patent claim if it includes parts or steps that are identical or equivalent to the requirements of the claim.  If the product or method is missing an identical or equivalent part or step to even one requirement of the asserted patent claim, the product or method cannot infringe the claim under the doctrine of equivalents.  Thus, in making your decision under the doctrine of equivalents, you must look at each individual requirement of the asserted patent claim and decide whether the product or method has either an identical or equivalent part or step to that individual claim requirement.

A part or step of a product or method is equivalent to a requirement of an asserted claim if a person of ordinary skill in the field would think that the differences between the part or step and the requirement were not substantial as of the time of the alleged infringement.

Changes in technique or improvements made possible by technology developed after the patent application is filed may still be equivalent for the purposes of the doctrine of equivalents if it still meets the other requirements of the doctrine of equivalents set forth in this instruction.

One way to decide whether any difference between a requirement of an asserted claim and a part or step of the product or method is not substantial is to consider whether, as of the time of the alleged infringement, the part or step of the product or method performed substantially the same function, in substantially the same way, to achieve substantially the same result as the requirement in the patent claim.

You may not use the doctrine of equivalents to find infringement if you find that the alleged infringer's product or method is the same as what was in the prior art before the application for the patent or what would have been obvious to persons of ordinary skill in the field in light of what was in the prior art.  A patent holder may not obtain, under the doctrine of equivalents, protection that it could not have lawfully obtained from the Patent and Trademark Office.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

United States District Court
For the Northern District of California

### 15. CONTRIBUTORY INFRINGEMENT

Contributory infringement may arise when someone supplies something that is used to infringe one or more of the patent claims.

In order for there to be contributory infringement, someone other than a party in this case must directly infringe a claim of a patent; if there is no direct infringement by anyone, there can be no contributory infringement.  If you find someone other than Good Technology has directly infringed a claim of MobileIron's '016 patent, then Good Technology is liable for contributory infringement if it is more likely than not that:

      1.  The party sold, offered for sale, imported or otherwise supplied an important component of the infringing part of the product or method;

      2.  The component is not suitable for substantial non-infringing use; and

      3.  The party supplied the component with knowledge of the patent and knowledge that the component was especially made or adapted for use in an infringing manner.

A "component suitable for substantial non-infringing use" is a component that has uses other than as a component of the patented product or other than in the patented method, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

**United States District Court**
For the Northern District of California

# 16. INDUCING PATENT INFRINGEMENT

MobileIron argues that Good Technology has actively induced another to infringe the '016 patent. In order for Good Technology to induce infringement, Good Technology must have induced another to directly infringe a claim of the '016 patent; if there is no direct infringement by anyone, there can be no induced infringement.  In order to be liable for inducement of infringement, Good Technology must:

     1.  have intentionally taken action that actually induced direct infringement;

     2.  have been aware of the '016 patent; and

     3.  have known that the acts it was causing would infringe the patent.

If the three requirements just stated are not met, Good Technology cannot be liable for inducement unless it actually believed that it was highly probably its actions would encourage infringement of a patent it believed to be valid and that it deliberately chose to avoid learning the truth.  To prove inducement, it is not enough that Good Technology was merely indifferent to the possibility that its actions might encourage infringement of a valid patent.  Nor is it enough that Good Technology took a risk that was substantial and unjustified.

In decided whether Good Technology induced infringement, you may consider whether Good Technology actually believed that the acts it encouraged did not infringe the patent.

United States District Court
For the Northern District of California

**17. INVALIDITY—BURDEN OF PROOF**

I will now instruct you on the rules you must follow in deciding whether or not a patent claim is invalid. Before discussing the specific rules, I want to remind you about the standard of proof that applies to this defense.  To prove that any claim of a patent is invalid, you must be persuaded by clear and convincing evidence, i.e., the evidence must produce in your minds a firm belief or conviction that the claim is invalid.

United States District Court
For the Northern District of California

## 18. WRITTEN DESCRIPTION

The patent law contains certain requirements for the part of the patent called the specification. Patent claims may be invalid if the patent specification does not contain an adequate written description of the claimed invention.

To show that a patent claim lacks an adequate written description, it must be shown by clear and convincing evidence that the specification fails to meet the law's requirements for written description of the invention. In the patent application process, the applicant may keep the originally filed claims, or change the claims between the time the patent application is first filed and the time a patent is issued. An applicant may amend the claims or add new claims. These changes may narrow or broaden the scope of the claims. The written description requirement ensures that the issued claims correspond to the scope of the written description that was provided in the original application.

In deciding whether the patent satisfies this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of technology of the patent when the application was filed. The written description requirement is satisfied if a person having ordinary skill reading the original patent application would have recognized that it describes the full scope of the claimed invention as it is finally claimed in the issued patent, even though the description may not use the exact words found in the claim.

The written description requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, etc., contained in the patent application. The full scope of a claim or any particular requirement in a claim need not be expressly disclosed in the original patent application if a person having ordinary skill in the field of technology of the patent at the time of filing would have understood that the full scope or missing requirement is in the written description in the patent application.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

**19. INVALIDITY—ANTICIPATION**

A patent claim is invalid if the claimed invention is not new. For the claim to be invalid because it is not new, each and every element in the claim must have existed in a single device or method that predates the claimed invention, or must have been described in a single previous publication or patent that predates the claimed invention.  In patent law, these previous devices, methods, publications or patents are called "prior art references." If a patent claim is not new we say it is "anticipated" by a prior art reference.  You may not combine two or more items of prior art to find anticipation.  Anticipation must be determined on a claim-by-claim basis.

The description in the written reference does not have to be in exactly the same words as the claim, but all of the requirements of the claim must be there, either stated or necessarily present, so that someone of ordinary skill in the field of the patent looking at that one reference would be able to make and use the claimed invention.

To succeed in showing that a patent claim is invalid as anticipated by alleged prior art, the party asserting invalidity must convince you of this by clear and convincing evidence, in other words, it must present evidence that highly probably demonstrates that the claims are invalid and produces in your minds a firm belief or conviction that the claims are invalid.

Here is a list of the ways it can be shown that a patent claim was not new:

> – if the claimed invention was already publicly known or publicly used by others in the United States before the date of the invention;

> – if the claimed invention was already patented or described in a printed publication, anywhere in the world before the date of the invention or more than a year before the effective filing date of the application for the patent. An invention was patented by another if the other patent describes the same invention claimed by the patent holder to a person having ordinary skill in the technology.  A reference is a "printed publication" if it is accessible to those interested in the field, even if it is difficult to find;

> – if the claimed invention was publicly used, sold, or offered for sale in the United States more than one year before the effective filing date of the application for the patent. An invention was publicly used when it was either accessible to the public or commercially exploited;

> – if the claimed invention was described in a published patent application filed by another in the United States before the date of the invention;

> – if the claimed invention was described in a patent granted on an application for patent by another filed in the United States and the application was filed before the date of the invention and the filing date of the application for the patent;

> – if the claimed invention was already made by someone else in the United States before the date of invention, if that other person had not abandoned the invention or kept it secret;

The date of invention is either when the invention was reduced to practice or when conceived, provided the inventors were diligent in reducing the invention to practice.

21

Diligence means working continuously, though not necessarily every day.

Conception is the mental part of an inventive act, i.e., the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice, even if the inventor did not know at the time that the invention would work. Conception of an invention is complete when the idea is so clearly defined in the inventor's mind that, if the idea were communicated to a person having ordinary skill in the field of the technology, he or she would be able to reduce the invention to practice without undue research or experimentation. This requirement does not mean that the inventor has to have a prototype built, or actually explained her or his invention to another person. But, there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea. Conception may be proven when the invention is shown in its complete form by drawings, disclosure to another person, or other forms of evidence presented at trial.

A claimed invention is "reduced to practice" when it has been tested sufficiently to show that it will work for its intended purpose or when it is fully described in a patent application filed with the PTO.

To be an inventor, one must make a significant contribution to the conception of at least one or more of the claims of the patent. Whether the contribution is significant is measured against the scope of the full invention.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

## 20. INVALIDITY—OBVIOUSNESS

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made.

It may be established that a patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of the patent.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of the patent that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art.

In considering whether a claimed invention is obvious, you may but are not required to find obviousness if you find that at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field of the patent to combine the known elements in a way the claimed invention does, taking into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known functions; (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions and (6) whether the change resulted more from design incentives or other market forces.

To find it rendered the invention obvious, you must also find that the prior art provided a reasonable expectation of success.

In determining whether the claimed invention was obvious, consider each claim separately. Do not use hindsight, i.e., consider only what was known at the time of the invention.

In making these assessments, you must also take into account any objective evidence (sometimes called "secondary considerations") that may have existed at the time of the invention and afterwards that may shed light on whether or not the claimed invention would have been obvious, such as:

1. Whether the invention was commercially successful as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure advertising or similar activities);

2. Whether the invention satisfied a long-felt need;

3. Whether others had tried and failed to make the invention;

4. Whether others invented the invention at roughly the same time;

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

5.  Whether others copied the invention;

6.  Whether there were changes or related technologies or market needs contemporaneous with the invention;

7.  Whether the invention achieved unexpected results;

8.  Whether others in the field praised the invention;

9.  Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

10.  Whether others sought or obtained rights to the patent from the patent holder; and

11.  Whether the inventor proceeded contrary to accepted wisdom in the field.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

## 21. INVALIDITY—LEVEL OF ORDINARY SKILL

In deciding what the level of ordinary skill in the field of the invention is, you should consider all the evidence introduced at trial, including but not limited to: (1) the levels of education and experience of the inventor and other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; and (5) the sophistication of the technology.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

United States District Court
For the Northern District of California

## 22. UNCLEAN HANDS

The owner of a patent may be barred from enforcing the patent against an infringer where the owner of the patent acts or acted inequitably, unfairly, or deceitfully towards the infringer or the Court in a way that has immediate and necessary relation to the relief that the patent holder seeks in a lawsuit.  This is referred to as "unclean hands," and it is a defense that MobileIron contends precludes any recovery by Good Technology in this lawsuit.

Unclean hands is also a defense to Good Technology's false advertising claim.  In bringing a claim for false advertising, Good Technology should not be guilty of any false or misleading representation in its own advertisements.   If MobileIron can demonstrate that Good Technology acted inequitably in a way that relates to the subject matter of Good Technology's false advertising claim, Good Technology may be barred from seeking relief.

You must consider and weigh all the facts and circumstances to determine whether you believe that, on balance, Good Technology acted in such an unfair way in the matters relating to the controversy between Good Technology and MobileIron that, in fairness, Good Technology should be denied the relief it seeks in this lawsuit.  MobileIron must prove unclean hands by a preponderance of the evidence.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

**23. FALSE ADVERTISING DAMAGES**

If you find for Good Technology on its false advertising claim, you must determine the amount of MobileIron's profits, if any, that Good is entitled to.  This is known as "disgorgement" of MobileIron's profits.  Disgorgement is intended to award profits only on sales that are attributable to the false advertising.  Once Good Technology has identified MobileIron's gross profits resulting from the false advertising, the burden shifts to MobileIron to show any costs that should be deducted from that amount.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

## 24. PATENT DAMAGES

I will instruct you about the measure of damages.  By instructing you on damages, I am not suggesting which party should win on any issue.  If you find that a valid claim of a patent has been infringed, you must determine the amount of money damages to be awarded to the patent holder to compensate it for the infringement.

The amount of those damages must be adequate to compensate the patent holder for the infringement.  A damages award should put the patent holder in approximately the financial position it would have been in had the infringement not occurred, but in no event may the damages award be less than a reasonable royalty.  You should keep in mind that the damages you award are meant to compensate the patent holder and not to punish an infringer.

The patent holder has the burden to persuade you of the amount of its damages.  You should award only those damages that the patent holder more likely than not suffered.  While a patent holder is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty.  A patent holder is not entitled to damages that are remote or speculative.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

**United States District Court**
For the Northern District of California

## 25. PATENT DAMAGES—DATE OF COMMENCEMENT

Damages that a patent holder may be awarded by you commence on the date that the alleged infringer has both infringed and been notified of the patent.

Good Technology and MobileIron agree that for Good's allegations that MobileIron's products infringe the Good Technology patents, the date of commencement was November 14, 2012.

Good Technology and MobileIron agree that for MobileIron's allegations that Good Technology's products infringe MobileIron's patent, the date of commencement was March 1, 2013.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

# 26. DAMAGES—REASONABLE ROYALTY

If you determine that any products made, used or sold by an alleged infringer have infringed any valid claims of any of the patents at issue in this case, then the patent holder should be awarded at least a reasonable royalty.

A royalty is a payment made to a patent holder in exchange for the right to make, use or sell the claimed invention. This right is called a "license." A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the infringer taking place at the time when the infringing activity first began. Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation. In considering this hypothetical negotiation, you must assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement. You must also assume that both parties believed the patent was valid and infringed. Your role is to determine what the result of that negotiation would have been. The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

A royalty can be calculated in several different ways and it is for you to determine which way is the most appropriate based on the evidence you have heard. One way to calculate a royalty is to determine what is called an "ongoing royalty." To calculate an ongoing royalty, you must first determine the "base," that is, the product on which the infringer is to pay. You then need to multiply the revenue the defendant obtained from that base by the "rate" or percentage that you find would have resulted from the hypothetical negotiation. For example, if the patent covers a nail, and the nail sells for $1, and the licensee sold 200 nails, the base revenue would be $200. If the rate you find would have resulted from the hypothetical negotiation is 1%, then the royalty would be $2, or the rate of 0.01 times the base revenue of $200. By contrast, if you find the rate to be 5%, the royalty would be $10, or the rate of 0.05 times the base revenue of $200. These numbers are only examples, and are not intended to suggest the appropriate royalty rate.

Instead of a percentage royalty, you may decide that the appropriate royalty that would have resulted from a hypothetical negotiation is a fixed number of dollars per unit sold. If you do, the royalty would be that fixed number of dollars times the number of units sold.

If the patent covers only part of the product that the infringer sells, then the base would normally be only that feature or component. For example, if you find that for a $100 car, the patented feature is the tires which sell for $5, the base revenue would be $5. However, in a circumstance in which the patented feature is the reason customers buy the whole product, the base revenue could be the value of the whole product. Even if the patented feature is not the reason for customer demand, the value of the whole product could be used if, for example, the value of the patented feature could not be separated out from the value of the whole product. In such a case, however, the rate resulting from the hypothetical negotiation would be a lower rate because it is being applied to the value of the whole product and the patented feature is not the reason for the customer's purchase of the whole product.

It is up to you, based on the evidence, to decide what royalty is appropriate in this case.

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 27. PATENT DAMAGES—REASONABLE ROYALTY—RELEVANT FACTORS

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are:

1.  The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

2.  The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.

3.  The nature and scope of the license, as exclusive or nonexclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4.  The licensor's established policy and marketing program to maintain his or her patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5.  The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

6.  The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items,  and the extent of such derivative or convoyed sales.

7.  The duration of the patent and the term of the license.

8.  The established profitability of the product made under the patents, its commercial success, and its current popularity.

9.  The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

10.  The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

11.  The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

12.  The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions.

13.  The portion of the realizable profits that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.  The opinion and testimony of qualified experts.

15.  The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee— who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty the infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people. The final factor establishes the framework which you should use in determining a reasonable royalty, that is, the payment that would have resulted from a negotiation between the patent holder and the infringer taking place at a time prior to when the infringement began.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

United States District Court
For the Northern District of California

# 28. PATENT DAMAGES—REASONABLE ROYALTY—USE OF SETTLEMENT AGREEMENTS

The damages experts for both parties in this case have referred to settlement agreements in connection with their opinions as to the reasonable royalties that would be owed if you find infringement of a valid patent claim.  Each of these settlement agreements cover patents other than, or in addition to, the patents-in-suit.

There are several things you must keep in mind when considering such evidence of settlement agreements.

First, where a settlement agreement covers patents other than, or in addition to, the patent under consideration, you should consider whether the party advocating the use of the settlement agreement has established that the scope of the rights conveyed in the settlement agreement is comparable in scope to the license that would result from the hypothetical negotiation concerning the patent under consideration. If it is not, you should consider whether the party advocating the use of the settlement agreement has established that a portion of the consideration for that agreement can be attributed with reasonable certainty to the use of the technology protected by the patent under consideration.

Second, the license fees negotiated during the course of a lawsuit may be influenced by factors unrelated to the value of the patent or patents that are the subject of the settlement agreement. Such factors may include a threat of high litigation costs that may be strongly influenced by a desire to avoid full litigation, as well as the threat of an injunction, enhanced damages for willful infringement, and future litigation.

Third, whether the settlement agreements were negotiated on dates that are earlier or later than the date on which the alleged infringement began, and whether the economic circumstances were different at the time the settlement agreements were negotiated compared to the time of the alleged infringement are factors to consider regarding whether the settlement agreements are relevant to the hypothetical negotiation between Good Technology and MobileIron in this case. The negotiation assumed in the hypothetical negotiation is assumed to take place just before the alleged infringement begins.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

### 29. PATENT DAMAGES—REASONABLE ROYALTY—COMPARABILITY OF LICENSE AGREEMENTS

One of the factors you should consider in determining a reasonable royalty is whether there are agreements that are comparable to the license that would result from the hypothetical negotiation concerning a particular patent in suit. Both parties have presented expert testimony to establish a reasonable royalty. In attempting to establish a reasonable royalty, agreements relied on by the parties' experts must be sufficiently comparable to the hypothetical license at issue in suit.

When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice. The circumstances surrounding a comparable agreement, however, do not need to be identical to those surrounding the hypothetical negotiation because any reasonable royalty analysis necessarily involves an element of approximation and uncertainty.

You should exercise vigilance when considering past licenses to technologies other than the patent in suit. Your evaluation of the comparability of a past license to the hypothetical license agreement the parties to this lawsuit would have negotiated should involve consideration of the comparability of the technology (in the past agreement as compared with the hypothetical agreement the parties here would have reached) as well as consideration of the comparability of the commercial terms and economic circumstances (in the past agreement as compared with the hypothetical agreement the parties here would have reached). When considering past agreements and technologies other than the patent in suit, the party advocating a particular agreement must account for differences in the technologies and economic circumstances of the contracting parties.

In evaluating whether a license agreement advanced by a party is comparable to the license that would result from the hypothetical negotiation concerning a particular patent in suit, the following factors may be considered:

1. The date of the agreement;

2. The type of agreement;

3. The scope of the agreement, including that it may include more patents than are at issue in this action;

4. Whether the agreement includes both accused and non-accused technology;

5. The relationship between the parties to the agreement;

6. The intended use of the technology; and

7. Any other of the relevant factors listed above in Instruction No. 29.

**30. NON-INFRINGING SALES**

If you find that a patent is only infringed through conduct other than sales of an accused product, you may not award a reasonable royalty based on sales of the accused product.  The reasonable royalty you award must instead relate only to the activity constituting patent infringement.  For example, if you find that a patent is infringed only through internal testing of a particular feature, the reasonable royalty you award should be specifically tied to evidence of the value of that testing.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

**31. NO COPYING**

In this case, neither party has raised any assertion of improper copying, copyright infringement, trade secret misappropriation, or unauthorized access or use of the other party's information.  The only claims raised by the parties are based upon patent infringement and the Lanham Act.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

United States District Court
For the Northern District of California

**32. DUTY TO DELIBERATE**

When you begin your deliberations, you should elect one member of the jury as your presiding juror.  That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should.  Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

### 33. COMMUNICATION WITH COURT

If it becomes necessary during your deliberations to communicate with me, you may send a note through Mr. Rivera, signed by your presiding juror or by one or more members of the jury.  No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the parties before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the court.

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

**United States District Court**
For the Northern District of California

**34. RETURN OF VERDICT**

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

**SO ORDERED.**

Dated: July 31, 2015

PAUL S. GREWAL
United States Magistrate Judge

Case No. 5:12-cv-05826-PSG
AMENDED FINAL JURY INSTRUCTIONS

United States District Court
For the Northern District of California